## State of Connecticut *v.* John McCarthy
### (10917)

Peters, C. J., Healey, Shea, Dannehy and Santaniello, Js.

Argued April 30—decision released August 20, 1985

*Bruce L. Levin,* for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Henry J. Lyons,* assistant state's attorney, for the appellee (state).

Shea, J. On May 20, 1981, the defendant, John McCarthy, was found by a jury to have committed the

crimes of larceny in the first degree and burglary in the third degree in violation of General Statutes §§ 53a-122 (a) (2) and 53a-103 (a), respectively, and was sentenced to an effective prison term of not less than ten nor more than twenty years. From this judgment the defendant appeals, claiming that the trial court erred (1) in denying his fair cross-section challenge to the jury array, (2) in failing to suppress inculpatory statements that he gave to the police after a claimed illegal arrest and that were allegedly prompted by promises of beneficial treatment, (3) in permitting cross-examination of the defendant beyond what he claimed was the scope of direct, and (4) in refusing to instruct the jury on the crimes of larceny in the second and third degrees as lesser included offenses. We find no error.

On June 20, 1980, the defendant was arrested by the Westport police on charges unrelated to those at issue here. Knowing that the defendant was a suspect in certain burglaries that had occurred in Wilton, the Westport police contacted the Wilton police and informed them that the defendant was in custody. The next day, two Wilton police officers spoke with the defendant at the jail in Westport, and then took him for a drive through Wilton, where the defendant incriminated himself in several burglaries, including the one involved in this appeal. More than two weeks later, a warrant was issued for the arrest of the defendant for the present burglary and larceny. At trial the defendant stipulated that he had committed the theft in question, but denied having the requisite mental state for the crimes charged. He also contested the valuation of the property stolen. The jury found him guilty of the crimes charged.

## I

In support of his claim that he was deprived of his due process right to a jury made up of a fair cross sec-

tion of the population,[1] the defendant presented expert testimony that, of the 12,351 persons called for jury duty in Fairfield county during the two and one-half year period immediately preceding his trial in April, 1981, only 240, or 1.9 percent, had Hispanic surnames. On the basis of the Hispanic population of Fairfield county as documented by the United States census of 1970,[2] 3.75 percent of the 12,351 potential jurors, or 465 Hispanics, should have been included in the venires. The plaintiff's expert testified that the chance of this disparity occurring randomly was less than one in two and one-half million based on "statistical decision theory."[3] The court denied the challenge to the array without elaboration.[4]

---

[1] In *Taylor* v. *Louisiana,* 419 U.S. 522, 526–31, 95 S. Ct. 672, 42 L. Ed. 2d 690 (1975), it was determined "that the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial" that is applicable to the states by virtue of the due process clause of the fourteenth amendment to the United States constitution. Id., 528. This holding was reinforced in *Duren* v. *Missouri,* 439 U.S. 357, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979).

[2] The trial court refused to admit the applicable figures contained in the 1980 census because the 1980 census results were at that time provisional. The defendant does not claim error in that ruling, but instead urges this court to take judicial notice of results of the final 1980 census now available. We decline to take judicial notice of facts that were not available, and therefore could not have been judicially noticed, at the time of trial. See *State* v. *Kilpatrick,* 1 Conn. Cir. Ct. 298, 303, 23 Conn. Sup. 437, 184 A.2d 191 (1962). To hold otherwise would be to permit a party to appeal a case on a basis completely different from that presented below, essentially rendering the lower court decision superfluous. The judicial notice of facts unavailable at the time of trial would be inconsistent with the appellate function of this court. *Styles* v. *Tyler,* 64 Conn. 432, 449–56, 30 A. 16 (1894); cf. *People* v. *Harris,* 36 Cal. 3d 36, 679 P.2d 433, 201 Cal. Rptr. 782 (1984).

[3] The statistical decision theory as it applies to jury array challenges was propounded in Finkelstein, "The Application of Statistical Decision Theory to the Jury Discrimination Cases," 80 Harv. L. Rev. 338 (1966), and discussed in *Casteneda* v. *Pardita,* 430 U.S. 482, 497 n.17, 97 S. Ct. 1272, 51 L. Ed. 2d 491 (1977).

[4] In *State* v. *Jones,* 193 Conn. 70, 475 A.2d 1087 (1984), we declined to review a challenge to a jury array where the defendant failed to obtain findings from the trial court on the subordinate questions of fact and failed

We have recently had occasion to consider the appropriate test to be applied to a fair cross section challenge of a jury array. In *State* v. *Castonguay,* 194 Conn. 416, 481 A.2d 56 (1984), we quoted from *Duren* v. *Missouri,* 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979), wherein the United States Supreme Court declared that " '[i]n order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.' *Duren* v. *Missouri,* supra, 364. Once the defendant has established this prima facie case, the burden then shifts to the state to prove that the selection system resulting in a nonrepresentative array furthers a significant state interest. Id., 367." *State* v. *Castonguay,* supra, 421–22.

With respect to the first requirement of *Duren,* we have noted on several occasions, and the state has conceded in this appeal, that Hispanics constitute a "distinctive" group in the community for purposes of this fair cross section claim. See *State* v. *Couture,* 194 Conn. 530, 551, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); *State* v. *Castonguay,* supra, 424.

In *State* v. *Castonguay,* supra, we discussed the different approaches used by courts in examining the second prong of *Duren,* the requirement of fair and

properly to set forth in his brief facts on the record that supported his claim. Id., 74 n.2. This defendant has likewise failed to request an articulation, but he has outlined in his brief the relevant facts before the trial court upon which his challenge to the jury array was rejected. We find that the defendant has presented a record adequate for appellate review.

reasonable representation of the group involved. We considered and rejected three such theories in that opinion, among them the statistical decision theory relied upon by the defendant, before settling on the "substantial impact" test as best suited to a fair cross section claim. We considered the statistical decision theory to be more relevant to the issue of discrimination posed in an equal protection challenge to jury composition than to the question of whether the jury pool reflects adequately the diversity of the community from which it is selected. See *Villafane* v. *Manson,* 504 F. Sup. 78, 84 (D. Conn. 1980).[5] Under the substantial impact test, on the other hand, the "focus is not on numbers and percentages but rather on whether the underrepresentation substantially affects the composition of the grand [or petit] jury." *State* v. *Couture,* supra, 552. Thus "[t]he disparity is measured in terms of its impact on juries, not simply percentages in the abstract. This analysis allows the courts to reject challenges when the challenged practices did not significantly alter the composition of the typical grand or petit jury." Beale, "Integrating Statistical Evidence and Legal Theory to Challenge the Selection of Grand and Petit Jurors," 46 Law and Contemp. Probs. 269, 275 (1983); see *United States* v. *Kleifgen,* 557 F.2d 1293, 1297 (9th Cir. 1977); *Anderson* v. *Casscles,* 531 F.2d 682, 685 n.1 (2d Cir. 1976); *United States* v. *Goff,* 509 F.2d 825, 826–27 (5th Cir.), cert. denied, 423 U.S. 857, 96 S. Ct. 109, 46 L. Ed. 2d 83 (1975); *United States* v. *Jenkins,* 496 F.2d 57, 65 (2d Cir. 1974), cert. denied, 420 U.S. 925, 95 S. Ct. 1119, 43 L. Ed. 2d 394 (1975); *United States* v.

---

[5] While a due process challenge to a jury array may be brought regardless of whether a defendant is a member of the group he claims to have been excluded from jury service; *Duren* v. *Missouri,* 439 U.S. 357, 359 n.1, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979); *Taylor* v. *Louisiana,* 419 U.S. 522, 526, 95 S. Ct. 672, 42 L. Ed. 2d 690 (1975); standing to advance an equal protection claim is limited to members of the excluded group. *Casteneda* v. *Pardita,* 430 U.S. 482, 494, 97 S. Ct. 1272, 51 L. Ed. 2d 491 (1977). The defendant here does not claim to be a member of the Hispanic community.

*Facchiano,* 500 F. Sup. 896 (S.D. Fla. 1980); see also *Waller* v. *Butkovich,* 593 F. Sup. 942 (M.D.N.C. 1984).[6] Using this common sense approach, we recently determined that one less Hispanic on every other eighteen member grand jury did not constitute the "substantial" underrepresentation of a distinct group that is a prerequisite to judicial intervention in a fair cross section challenge. *State* v. *Couture,* supra, 552; *State* v. *Castonguay,* supra, 430–31; *State* v. *Haskins,* 188 Conn. 432, 440, 450 A.2d 828 (1982).

The defendant has provided us with no reason to abandon this analysis, and we are not inclined to do so. The remaining question then is whether there was such an underrepresentation of Hispanics, compared to their population in the community as a whole,[7] in the pools from which jurors in Fairfield county were drawn during the period from September, 1978, to April, 1981, as to have substantial impact upon the composition of Fairfield juries. We conclude that no such impact has been shown. According to the defendant's figures, of the 12,351 potential jurors during the period examined, 240 or 1.9 percent were Hispanics. The 3.75 percent of Hispanics in the community, if this group were proportionally represented in the jury pool, would have resulted in the inclusion of 465 Hispanics, 225 more than were actually contained in the pool of jurors.[8]

---

[6] We agree with the observation in *United States* v. *Test,* 550 F.2d 577, 584 (10th Cir. 1976), that "the mathematical conclusion that the disparity between . . . two figures is 'statistically significant' does not . . . require an *a priori* finding that these deviations are 'legally significant.' "

[7] "From time immemorial in this state, the community unit which is the basis for the source of a jury array is that of the county . . . . The issue to be determined then is whether the array was a fair cross section of that community." *State* v. *Townsend,* 167 Conn. 539, 551, 356 A.2d 12, cert. denied, 423 U.S. 846, 96 S. Ct. 84, 46 L. Ed. 2d 62 (1975).

[8] The courts that have continued to employ an absolute discrepancy test; see *State* v. *Castonguay,* 194 Conn. 416, 428, 481 A.2d 56 (1984); have required a deviation from community composition much greater than that shown by the defendant's evidence here. See, e.g., *United States* v. *Tuttle,*

The 12,351 veniremen would, if divided into juries of six, which hear cases such as the defendant's, have served 2000 potential juries. See General Statutes §§ 54-82 (c), 54-82b (c). Were the 225 missing Hispanic jurors evenly distributed among this number of juries, one more Hispanic would have been available for selection on only one out of nine juries. This is a substantially smaller discrepancy than those we upheld in *Couture* and *Castonguay.* The lesser numerical discrepancy found here, as compared to those cases involving Hispanic representation on grand juries, must be balanced against the greater influence a single juror may have in a group of six, comprising a petit jury, rather than eighteen persons, necessary for a grand jury. The decision of the six must be unanimous while only twelve of eighteen grand jurors must agree upon an indictment. General Statutes § 54-45 (b). Even taking this into account, however, we cannot conclude that the underrepresentation of Hispanics in the jury venires of Fairfield county was so substantial as to violate the defendant's due process right to a jury representing a fair cross section of the community. Accord Beale, supra, 280;[9] see also *United States* v. *Armstrong,* 621 F.2d 951, 955–56 (9th Cir. 1980); *United States* v. *Potter,* 552 F.2d 901, 905–906 (9th Cir. 1977); *United States* v. *Nordwall,* 555 F. Sup. 37 (D. Nev. 1982); *State* v. *Elbert,* 424 A.2d 1147, 1149 (N.H. 1981). "It should . . . be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit

---

729 F.2d 1325, 1327 (11th Cir. 1984); *United States* v. *Yazzie,* 660 F.2d 422 (10th Cir. 1981), cert. denied, 455 U.S. 923, 102 S. Ct. 1282, 71 L. Ed. 2d 464 (1982).

[9] "The courts that have applied the impact standard have generally concluded that the challenger failed to prove a sufficient disparity when proportionate minority representation would have added only one or two additional minority jurors to a typical grand or petit jury." Beale, "Integrating Statistical Evidence and Legal Theory to Challenge the Selection of Grand and Petit Jurors," 46 Law and Contemp. Probs. 269, 280 (1983).

juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition . . . but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor* v. *Louisiana,* 419 U.S. 522, 538, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975). We conclude that the veniremen from whom the defendant's jury was drawn were sufficiently representative to provide a "fair possibility for obtaining a truly representative cross section." *State* v. *Nims,* 180 Conn. 589, 595, 430 A.2d 1306 (1980), quoting *United States* v. *Kennedy,* 548 F.2d 608, 614 (5th Cir. 1977). The defendant, therefore, has not sustained his burden of proving a lack of fair and reasonable representation of Hispanics in the array from which his jury was selected.

The defendant was not deprived of his right to a jury drawn from a fair cross section of the community and the trial court did not err in denying his challenge to the jury array.

## II

The defendant next claims that his inculpatory statements made to the Wilton police should have been suppressed because they resulted from an illegal arrest and were elicited under such circumstances as to impinge upon their voluntariness. We conclude that the trial court did not err in refusing to suppress the statements.

## A

The defendant claims an illegal arrest by virtue of his being in the physical custody of two Wilton police officers from the time he left the Westport police station for his trip to Wilton until he was returned to Westport. He maintains that acquisition of his custody by

the Wilton officers was an arrest. The defendant continues further that the Wilton police officers had no cause or authority to arrest him at that time and that any confession he made to them resulted directly from the illegal arrest.

We have recognized that the fourth amendment to the United States constitution requires suppression of statements obtained as a result of an illegal arrest " 'in order to deter similar police misconduct in the future and to protect the integrity of the courts.' " *State* v. *Perry,* 195 Conn. 505, 508, 488 A.2d 1256 (1985), quoting *State* v. *Derrico,* 181 Conn. 151, 157, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980); see *Dunaway* v. *New York,* 442 U.S. 200, 216, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979); *Brown* v. *Illinois,* 422 U.S. 590, 600–603, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975); *Wong Sun* v. *United States,* 371 U.S. 471, 487–88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). We find this principle to be inapplicable in this case because the essential predicate of an illegal arrest, or any arrest by the Wilton police, is lacking.

It cannot be denied that the defendant was under arrest during his trip through Wilton. In *Dunaway* v. *New York,* supra, 216, the court equated an arrest with "detention for custodial interrogation," which the Wilton officers undeniably conducted. It is equally clear that the Wilton police had not arrested the defendant before he confessed but that his custody had been transferred to them by the Westport police who had arrested him. The defendant does not challenge the legality of his arrest by the Westport police. The defendant's claim, therefore, goes not to the legality of his arrest, but to the authority of the Wilton police to hold him in custody pending disposition of the Westport charges. In analyzing this claim, we start with a recognition that after the defendant had been given *Miranda* warnings he expressed his consent when asked to accompany the

Wilton officers. The defendant can hardly be heard now to complain about the place of his custody or the authority of his custodians when he voluntarily consented to go with these officers on the trip to Wilton. Cf. *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 246, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *State* v. *Anonymous (1981–1),* 37 Conn. Sup. 755, 759–60, 436 A.2d 789 (1981).

Moreover, once a prisoner is lawfully in custody and thus deprived of his freedom, he has no constitutional basis for complaining about the identity of those assigned to hold him by the arresting authority. The temporary transfer of the defendant's custody from the Westport police authorities, who had arrested him legally, to the Wilton officers did not constitute a new arrest requiring those officers to have justification for such an arrest. We conclude that the lawful deprivation of the defendant's liberty resulting from his unchallenged arrest by the Westport police was still in force at the time he made the statements concerning his involvement in the Wilton offenses. Those statements, therefore, were not the product of an illegal arrest, as the defendant asserts and his claim of a fourth amendment violation is without merit.

## B

The defendant's second argument for suppression focuses on comments made to him by the Westport police claimed to constitute promises that impermissibly induced his confession to the Wilton police. See *Brady* v. *United States,* 397 U.S. 742, 753, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970); *Bram* v. *United States,* 168 U.S. 532, 542, 18 S. Ct. 183, 42 L. Ed. 568 (1897). During the suppression hearing, Officer Gary Tranberg of the Westport police testified that the defendant was a known drug addict and was experiencing drug withdrawal symptoms shortly after his arrest. The follow-

ing exchange then occurred between defense counsel and Tranberg. Counsel: "Did you ever talk to Mr. McCarthy about anything to the effect that, if he gave a statement concerning the houses that he burglarized, that you would help him get into a drug program or help him in any way concerning [his] drug habit?" Tranberg: "We had indicated to him that if he did cooperate with us, we would make that indication to the prosecutor and also indicate the fact that he was a drug addict and he did need some medical treatment for his drug addiction. I, certainly, never said that I was going to get him into a drug program per se." Tranberg also testified that the defendant was told that if he cooperated with respect to the Westport crime, for which he had been arrested, no other warrants would be issued "[a]s far as the town of Westport is concerned." This conversation with the defendant took place on the morning of June 20, 1981, the day before the defendant confessed to the Wilton burglaries. The defendant generally corroborated Tranberg's account, but also testified that the Wilton police "promised me the same thing the Westport Police promised me," that being "[n]o warrants. And then when I went to court, they and the Westport Police would be there to request the Prosecutor that I be given a drug program." The Wilton police denied making any such promises.

" 'It is the state's burden to prove by a preponderance of the evidence that the challenged confession was made voluntarily. *Lego* v. *Twomey*, 404 U.S. 477, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); *State* v. *Hawthorne*, 176 Conn. 367, 370, 407 A.2d 1001 (1978). The test of voluntariness is whether an examination of all the circumstances shows that the conduct of the police was such as to overbear the defendant's will to resist and bring about a confession, not freely self-determined.' (Citations omitted.) *State* v. *DeForge*, 194 Conn. 392, 397–98, 480 A.2d 547 (1984); see also *State* v.

*Stankowski,* 184 Conn. 121, 131–32, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981)." *State* v. *Perry,* supra, 516.

With respect to the promises claimed to have been made by the Wilton police, we are presented with a plain question of fact involving the credibility of witnesses. "This court cannot retry the facts or pass upon the credibility of the witnesses. *Johnson* v. *Flammia,* 169 Conn. 491, 497, 363 A.2d 1048 (1978)." *State* v. *Hawthorne,* supra, 371; *State* v. *DeForge,* supra, 398. Where the trial court found against the defendant on the ultimate issue without articulation, we may assume that it resolved any underlying factual disputes against him as well. See *State* v. *Jones,* 193 Conn. 70, 79, 475 A.2d 1087 (1984); *State* v. *Schonagel,* 189 Conn. 752, 762, 459 A.2d 106 (1983), vacated and remanded, 465 U.S. 1002, 104 S. Ct. 990, 79 L. Ed. 2d 224 (1984); *State* v. *Reddick,* 189 Conn. 461, 470 n.8, 456 A.2d 1191 (1983). On the basis of the record before us, it has not been established that any promises were made by the Wilton police, and we decline to pass upon a version of events not established by the record. See *State* v. *Perry,* supra, 516.

The situation differs as to the promises by the Westport police, concerning which there was no factual dispute at trial. It is clear, however, that the trial court could have found that the defendant understood those promises to relate only to his interaction with the Westport police and not his subsequent dealings with the Wilton police. When he testified at the suppression hearing, the defendant stated that the Westport police "promised me that if I had agreed to help them with any investigation and any burglaries *pertaining within Westport,* that they would take me to the hospital so I could get medication for my withdrawals. And when I went to court for this charge, they would see that I would be given a drug program." (Emphasis added.)

Similarly, Tranberg's testimony concerning the promise that no other warrants would be issued against the defendant aside from that for which he was already in custody was qualified to apply only *"[a]s far as the Town of Westport is concerned."* (Emphasis added.) Given the limits of these promises, it would have been fair for the trial court to conclude that they had no impact on the defendant's decision to confess to having committed crimes in Wilton. " 'A confession, otherwise freely and voluntarily made, is not vitiated by a promise of leniency unless such promise was the motivating cause of the confession.' (Citations omitted.) *State* v. *Tardiff,* 374 A.2d 598, 601 (Me. 1977)." *State* v. *Perry,* supra, 519.

Thus neither the nature of the defendant's custody nor any promises made to him[10] required a finding that the defendant's confession was inadmissible, and the trial court did not err in denying his motion to suppress.[11]

### III

The defendant's third claim of error relates to the questions asked of him on cross-examination after he had exercised his right to testify in his own behalf.[12] On direct examination, the defendant testified only

---

[10] Our conclusion that the promises that were made to the defendant did not relate to his Wilton confession makes it unnecessary for us to consider whether those promises were of such a nature as to vitiate an otherwise voluntary confession. Cf. *State* v. *Perry,* 195 Conn. 505, 519–20, 488 A.2d 1256 (1985); *State* v. *Carter,* 189 Conn. 631, 638–39, 458 A.2d 379 (1983).

[11] The defendant also made a motion to dismiss on the same grounds relied upon in his motion to suppress. It follows from our conclusion that the court did not err in failing to suppress the evidence that the defendant was not entitled to dismissal of the charges against him, and the trial court did not err in denying the motion.

[12] The defendant's claim at trial and on appeal is that the state's cross-examination sought to elicit information that was beyond the scope of direct examination. The defendant has made no constitutional claims involving his right not to incriminate himself, and therefore we have not analyzed his claim from that perspective.

about his drug addiction and the drugs he ingested on the day he entered the victim's home. On cross-examination, the state attempted to inquire about the defendant's actions preceding, during and directly following the time he entered the victim's home. The defendant objected on the ground that the state's inquiry was outside the scope of his direct examination. The state responded that the defendant's actions at the time in question related to his state of mind, which the defendant had put in issue through his testimony on direct. The trial court, noting that the defendant had earlier stipulated to having entered the victim's house and to having taken some property and was relying as a defense on a claimed lack of mental capacity, agreed with the state that the defendant's conduct at the time of the crime was a permissible subject of cross-examination. The defendant properly excepted.

The defendant correctly states the rule that "[t]he scope of cross-examination is limited by the scope of the direct examination unless there is an attack on the credibility of the witness." *State* v. *Zdanis,* 173 Conn. 189, 195, 377 A.2d 275 (1977); *State* v. *Thompson,* 191 Conn. 146, 148, 463 A.2d 611 (1983). The rule in its application is not so narrow as he would suggest, however. "It [is] within the broad discretion accorded the court in its control over the cross-examination to admit [a] question and forestall any erroneous impression which the jury might otherwise have obtained as to the significance of the actions of the contestants. The court could properly allow the proponents to inquire as to any facts which would tend to rebut or modify any material conclusion or inference resulting from the facts elicited on the direct examination. *Levine* v. *Marcus,* 90 Conn. 682, 684, 98 A. 348 [1916]." *Shulman* v. *Shulman,* 150 Conn. 651, 661, 193 A.2d 525 (1963).

The defendant's testimony on direct examination was plainly intended to raise an inference that his mental

state was such that at the time of the incident he could not have formed the intent requisite to criminal responsibility for the crimes charged. See General Statutes §§ 53a-103, 53a-119. The testimony elicited by the state relating to his thoughts and actions at that time was clearly intended to rebut that inference by showing the nonrandom and deliberate nature of his conduct. Moreover, given that the defendant had already stipulated that he had entered the victim's home and taken his possessions, it is difficult to perceive any prejudice to the defendant in the admission of this testimony. This evidence merely provided details of the entry and theft, the ultimate facts that had been already admitted. "[A]s a rule although the extent of cross-examination is within the trial court's discretion it should be liberally allowed. *State* v. *Reed,* 174 Conn. 287, 299, 386 A.2d 243 [1978]. Every reasonable presumption should be given in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. Reversal is required only where an injustice appears to have occurred. *State* v. *Martin,* 170 Conn. 161, 365 A.2d 104 [1976]; *State* v. *Brown,* 169 Conn. 692, 702, 364 A.2d 186 [1975]." *State* v. *Briggs,* 179 Conn. 328, 333, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980); see also *State* v. *Castro,* 196 Conn. 421, 426, 493 A.2d 223 (1985). We find no such injustice here.

## IV

Finally, the defendant claims error in the trial court's refusal to charge the jury on the crimes of larceny in the second and third degrees as lesser included offenses of first degree larceny. The trial court, after receiving the defendant's written request for a charge on these lesser degrees of larceny, instructed the jury only on the lesser offense of larceny in the fourth degree. At the time of the offense, the material distinction between the crimes was that of value. A theft constituted first

degree larceny if the property stolen was worth more than $2000; General Statutes (Rev. to 1979) § 53a-122; second degree if between $500 and $2000; General Statutes (Rev. to 1979) § 53a-123; third degree if between $50 and $500; General Statutes (Rev. to 1979) § 53a-124; and fourth degree if the property was worth less than $50 or was of undetermined value. General Statutes (Rev. to 1979) §§ 53a-125, 53a-121 (a) (3).

At trial, the state presented the testimony of the victim and his sister. Both described the flatware and other table pieces taken in the burglary of the victim's home on June 7, 1980, and indicated that most of the pieces taken were sterling silver. An expert for the state also identified many of the stolen pieces as sterling silver and valued them between $7839 and $8845. Two police officers testified that the defendant had told them that after he took the silver he sold it in New York for $2500. Aside from cross-examination of witnesses for the state, the defendant presented no evidence relating to the value of the stolen goods.

"A defendant is entitled to an instruction on a lesser offense if, and only if, the following conditions are met: (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser." *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980). Failure to charge on an included offense when this test

is met is reversible error. *State* v. *Harris,* 189 Conn. 268, 274–76, 455 A.2d 342 (1983); *State* v. *Falby,* 187 Conn. 6, 28–30, 444 A.2d 213 (1982).

Without having to consider the other elements, we find that the defendant has failed to satisfy the third prong of the *Whistnant* test and therefore was not entitled to the requested charge on larceny in the second and third degrees. In support of his claim of error, the defendant argues that because the jury could have disbelieved the evidence tending to prove the stolen items to be sterling silver, it might have determined the value of the items to have been less than that asserted by the state and thus to fall somewhere between $50 and $2000, the value range for second and third degree larceny. While this contention might be sufficient to satisfy the fourth requirement of *Whistnant,* the fact remains that there was no evidence placing the value at less than $2500. If the jury had concluded that the evidence of value was insufficient for first degree larceny, it was possible for it to find only that the value of the stolen property was undetermined, and that a fourth degree larceny had been committed. The third prong of *Whistnant* requires that there be "*some* evidence . . . which justifies conviction of the lesser offense." (Emphasis added.) *State* v. *Whistnant,* supra, 588. Evidence tending to show one value, if disbelieved, cannot be said to establish affirmatively another. *State* v. *Mayell,* 163 Conn. 419, 426–27, 311 A.2d 60 (1972); *Marquis* v. *Drost,* 155 Conn. 327, 332, 231 A.2d 257 (1967). Thus the weakness claimed in the state's proof that the property had a value of more than $2000 would not in itself justify a finding that its value fell within the range of $50 to $2000 for second and third degree larceny. There is no other evidence that would support such a finding and, thus, the third *Whistnant* criterion has not been satis-

fied. The court therefore did not err in refusing to charge on the crimes of second and third degree larceny.

There is no error.

In this opinion the other judges concurred.