STATE OF CONNECTICUT *v.* WILLIAM B. SCHROFF III
(13081)

PETERS, C. J., HEALEY, SHEA, GLASS and COVELLO, Js.

---

Argued November 4, 1987—decision released February 2, 1988

*Eric J. Bengston,* assistant public defender, for the appellant (defendant).

*Harry Weller,* deputy assistant state's attorney, with whom, on the brief, was *Timothy J. Liston,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant, William B. Schroff III, was found guilty, after a trial before a jury, of the crime of murder in violation of General Statutes § 53a-54a.[1] This appeal followed.

Prior to trial, the defendant moved to suppress all the statements that he had made to law enforcement officials between May 30, 1983, and July 11, 1984. These statements, nine in number, were made on September 12, 1983, September 21, 1983, September 26,

---

[1] General Statutes § 53a-54a provides in pertinent part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

1983, December 6, 1983, March 8, 1984, March 21, 1984, May 1, 1984, June 29, 1984, and July 11, 1984. The trial court denied the motion as to the statements of September 12, 1983, and September 21, 1983, finding, inter alia, that they were voluntarily given. It granted the motion as to all the other statements except as to a portion of the June 29, 1984 statement. In granting suppression, it found that they were involuntary, involving improper promises and inducements by the state police.

On appeal, the sole issue raised by the defendant is that the trial court erred in not suppressing as involuntary that portion of his June 29, 1984 statement given to state police detectives Michael Graham and James Cavanaugh when they showed him photos of the grave site of the murder victim, Laura Hill. We find no error in the trial court's ruling denying suppression. In resolving this appeal, we find it necessary to go into the circumstances of all the statements given because of the essential position of the parties on this question.

On July 10, 1982, Laura Hill disappeared from the Veterans' Administration Hospital in West Haven, which she had entered in June, 1982. On June 27, 1984, her body was discovered by the state police buried under a pile of rocks in a wooded area off Mount Parnassus Road in East Haddam.

On May 30, 1983, the defendant, while incarcerated at the New Haven Correctional Center on an unrelated charge, approached corrections officer Clifford Ewalt. He told Ewalt that he had been watching television every night and that he "was waiting for them to find the other body," "that it was about time that they find the other body." The defendant then proceeded to give Ewalt directions on where to find a body. While the defendant was giving these directions, Ewalt was drawing a map. He told Ewalt that he had buried a body

there, and that Ewalt was to go out and locate the body and come back and tell him that he had done so. After his shift had concluded, Ewalt, following the directions given to him, ended up in a wooded area off Mount Parnassus Road in East Haddam. When he arrived in East Haddam, Ewalt notified the state police, who responded, and Ewalt gave the map to one of the officers, who searched the area and took his statement. No body was found at that time.

In June, 1983, the defendant, who was still being held in a pretrial status, had been transferred to the Hartford Correctional Center. On June 27, 1983, he asked to talk to deputy warden Frank Crose at that facility to discuss a transfer back to the New Haven Correctional Center. Dissatisfied with an apparent offer by the state of "fifty years" concerning the trial that was imminent,[2] he indicated to Crose that "if the state police would give him a five minute head start, he would show them where a body was buried in the woods."

On July 5, 1983, the defendant, while in the New Haven courthouse to answer other pending charges, escaped from the courthouse but was recaptured later that day by a New Haven police officer. When that officer apprehended him, the defendant said: "[I]f you give me five minutes head start I'll take you where one of the bodies is buried."[3] He also indicated to this officer that he had observed a girl around the Veterans'

---

[2] Crose also testified that the defendant indicated to him that "the state's case was based primarily on the statement or on one witness and that if he did not appear at trial to testify against him, then the state would not have much of a case. He indicated that he was doing what he could to make sure that didn't happen."

[3] Two other New Haven police officers, Arthur Granucci and Robert DeNuzzo, who had contact with the defendant after his apprehension on July 5, 1983, testified that the defendant told them that in exchange for getting a five minute start he would tell them about a murder and where the body was buried. One officer said that the defendant told them he had buried the body in East Haddam by "a wall area."

Administration Hospital in West Haven and that he had picked her up in his van. They "[wound] up somewhere in Haddam or Higganum" where the girl was buried. He also indicated to this officer that a third person, a friend of his, had committed this murder and that the defendant had assisted with the burial.

On September 9, 1983, the defendant was sentenced in New Haven on unrelated charges. State police officers Paul Cusson and William Guida, Jr., were present in the court at the time of sentencing. Both officers went to the holding area to see the defendant who had asked to speak to them. After he asked the officers for their names and where he could contact them, they gave him their business cards. He told them that he was going to give them information on something. Nothing further took place at that time.

On September 12, 1983,[4] Cusson and Guida went to the state correctional institution at Somers to see the defendant. They did so because Somers officials had contacted them indicating that the defendant wanted to talk with them. The defendant signed a "willingness to be interviewed" form in order to speak with them on that occasion. On that date, he gave the officers general information about unrelated matters and also inquired whether they knew anything about a Laura Hill, a missing person from West Haven, who, he said, "might [have been] missing in either June or July, 1982." This was the first time that the defendant had referred to the victim by name. He indicated that he wanted the state to prosecute him "to the fullest so [that if] he had a chance to [escape] at any time during transportation, he would attempt to . . . . " At that time, the matter was "left" that the defendant "wanted [the officers] to return with any information concerning what he had told [them] already."

---

[4] This was the first of the meetings between the state police and the defendant.

On September 21, 1983, Guida and Cusson returned to Somers to see the defendant. Prior to this date, they had verified that Laura Hill had been at Veterans' Administration Hospital in West Haven and that the last time that she had been seen was in early July, 1982. In addition, prior to returning, the police, aware of Ewalt's information and in possession of Ewalt's map, had tried unsuccessfully to locate the grave site in East Haddam. The defendant again signed a consent form on September 21, 1983, to meet with the officers. Guida told the defendant that they had verified that Laura Hill was missing; the defendant told them that they could not "find her" unless he was with them. At the suppression hearing, Guida said that it would be fair to say that after this interview he was "interested" in the defendant as a suspect in the Hill case as well as an unrelated case involving the disappearance of another woman.

Guida and Cusson returned to Somers on September 26, 1983, to talk to the defendant. He signed another consent form to permit them to speak with him, as well as a written waiver of his *Miranda* rights. Unlike the prior interviews, however, this interview was tape recorded; the defendant was not "specifically" made aware that the conversation was being taped. The defendant was upset with the officers because they had not located the body from the information he had already given them. He indicated rather that he felt that they had located it and were not telling him but were more or less "stringing him along" to get more information from him. The officers told him that they had to obtain more information from him to give to their superiors, "something concrete," to show what he was telling the officers "was in good faith." The defendant indicated that if he were taken out, he did not want handcuffs or shackles and that he would like to have the "opportunity to escape or take off." More-

over, if he were taken out, it would have to be shortly before the weather got cold or they would have to wait until the weather got warm again. On that date, the officers did indicate to him that an attempt would be made to get him out "to look for items." At that interview, the police indicated that the defendant's "best bet" to get out was going to be through them. The police unsuccessfully tried to get authorization to get the defendant out to assist them.

On December 6, 1983, Guida and Cusson again went to Somers to see the defendant; the latter again signed a consent form to be interviewed by them. Between September 26 and December 6, 1983, Guida testified, "we further attempted" to see if there was any way to get the defendant out even though it was beyond the deadline set by him. The December 6, 1983 interview was "preserved" by a cassette tape; the defendant, however, was not made aware that the conversation was being taped. Among other things, he was told that the police needed "a little bit more information to try to find these items [relating to the Hill homicide] or something new . . . something a little more concrete." When mention was made of Laura Hill, the defendant said that he had told them "as much as he [could]" and that "[they were] going to have to wait again, until the summer time before he would be willing to go out and show [them] . . . ." There was further discussion about taking the defendant out at a later time. There was an unrelated case concerning which the police wanted information from him and in which he was a possible suspect. It was again indicated to the defendant that if he were going to get out that the two officers could not do it themselves, that they would need the help of others and so he should give them information to assist in this. According to Guida, they "really concentrated a lot on trying to find [Laura Hill's] location and the location of, at least, her clothing." Cusson

indicated to the defendant that revealing the location of the victim's clothing would be "least harmful" to him because it would be difficult to prove the clothes belonged to Laura Hill and that the probability of ever proving the clothes were hers "probably [was] about zip." The defendant asked them if the police still had his van or whether they were going "to get [it] again." There was some dialogue about something "that could be found in or about his van" that might be related to Laura Hill. In order that he remain cooperative with them, the officers indicated that they were willing to try again to get him out, but needed more information.

On March 2, 1984, Graham received a message from Somers that the defendant wanted to have them contact him by March 9, 1984, or "all bets [were] off." At that time, the defendant also requested that the police bring him his address book and watch, which had been seized earlier by the police, by March 9. Guida and Graham later visited the defendant at Somers and returned his watch and address book to him. They wanted the defendant, who had signed a consent to this interview, to continue to cooperate with them. There was discussion about an unrelated matter that also involved the discovery of the body of a female in early 1982. The defendant brought up the name of Laura Hill saying that he could take them to the location of her body and clothing. He also indicated that he wanted his van released from police custody. The van had been seized in connection with the investigation of another case.

On March 19, 1984, the defendant sent a message to the police concerning the release of his van. On March 21, 1984, Graham and Guida went to Somers to see the defendant, who signed the necessary forms in order to talk to the officers. The discussion included the unrelated crime referred to earlier, as well as the disappearance of Laura Hill. The defendant said that

his van had to be released from police custody by a certain date so as to be available to a friend of his who was leaving the state. The police said that they would check into the possibility of getting the van released but that they doubted they could meet the deadline that he had set.

On May 1, 1984, Graham went to Somers and saw the defendant, who again signed the necessary form to see the police. Graham had with him a court order that the defendant's van be returned to him. The defendant signed it, acknowledging receipt of the van, and thereby he was permitted to dispose of that vehicle in any manner he wished. As to Laura Hill,[5] the defendant said that if he were taken out, he would show the police where the body and clothing of Laura Hill were located. After that meeting, Graham contacted a state's attorney concerning obtaining a writ of habeas corpus to take the defendant out, but his efforts were not successful.

On June 27, 1984, the state police located the skeletal remains of Laura Hill buried beneath a pile of rocks adjacent to a stone wall in a wooded area off Mount Parnassus Road in East Haddam. At that time, the police took some Polaroid photographs of the burial site; a part of the skeletal remains was visible in the photographs.[6]

On June 29, 1984, Graham and Cavanaugh visited the defendant at Somers. Prior to the interview on that

[5] At that time, the defendant also indicated that he would show Graham the location of the clothing from the body of a female found in Lyme in early 1982.

[6] On direct examination of Graham, he was asked if, at the time the Polaroid photographs were taken by the police, "anything [had] been moved or rearranged in the area where the skeletal remains were found." He answered, "Yes," and when asked, "What?" Graham answered: "Several rocks had been removed by Detective David Bates who had made the initial discovery of the skeletal remains and the slight portion of the skull was visible within the pile of rocks."

date, the defendant signed the consent form to speak to the officers and he was given *Miranda* warnings which he indicated that he understood. After he was asked whether he was willing to talk to the officers and said that he was, the officers produced colored Polaroid photographs taken on June 27. The defendant looked at them[7] and asked what they were supposed to be. Graham indicated that he ought to know because he had provided the directions to the remains of Laura Hill and that this in fact was where the remains had been found. The defendant responded that "someone has moved the rocks, or the rocks had been moved." Nothing further was said about the photographs or the rocks or the remains. The defendant also indicated that if the police were able to obtain a writ of habeas corpus he would go out with them and show them the location of Laura Hill's clothing. He indicated that there might be something in the van that might tie him into "the disappearance [in] the case involving Laura Hill." In that same interview, he also provided additional information on a number of cases that "he had possible information of."

---

[7] At the time Graham showed the photographs to the defendant, who examined them, Graham testified that the following transpired:

"Q. And you said you showed these Polaroid photographs to Mr. Schroff?

"A. Yes, I did.

"Q. Did he look at them.

"A. Yes, he did.

"Q. And did he say anything upon looking at them?

"A. Yes, he did.

"Q. What did he say?

"A. He asked me what these were supposed to be.

"Q. And did you respond to that?

"A. I indicated to him that he ought to know what they were because he provided directions concerning the location of where the remains of Laura Hill [were] found and this in fact [was] where the remains had been found.

"Q. And did he respond to that explanation?

"A. Yes. His statement to me at that time I recall as being, well, someone has moved the rocks, or the rocks had been moved.

"Q. Were there any further discussions at that time about those photographs or the rocks or the remains?

"A. I don't believe so."

On July 11, 1984, Graham and Cavanaugh returned to Somers to talk to the defendant who signed the necessary consent forms to do so. This interview was at the request of the police. The inventory of articles in his van, concerning which there was some discrepancy claimed by the defendant, was discussed. On September 26, 1984, the defendant was arrested for the murder of Laura Hill.

On July 24, 1986, in a comprehensive oral opinion,[8] the trial court suppressed all the defendant's statements to the state police from the September 26, 1983 statement through and including the statement of July 11, 1984, with the exception of that portion of the conversation of June 29, 1984, that took place when the state police showed the defendant "a picture of the remains of the victim . . . Laura Hill." At the conclusion of the testimony in the suppression hearing, defendant's counsel withdrew his motion to suppress as to the statements to corrections officer Ewalt on May 30, 1983, and to deputy warden Crose on June 27, 1983.

The trial court denied suppression of the defendant's statements to the state police on September 9, 1983, and September 12, 1983. Essentially, the court found that these statements had been voluntary and that his *Miranda* rights had been validly waived. In doing so, it found that the police had made him no improper promises or inducements and that his will had not been overborne. As to the statement of September 21, 1983, the court found that the defendant had first articulated a proposed deal with the state police when he had agreed to lead them to the victim's body and other evidence if he was taken out of prison for that purpose. It also found that there had been no "explicit bargaining" by the police with the defendant.

---

[8] The trial court's oral opinion comprises thirty-five pages in the trial transcript. The suppression hearing extended over a period of five days.

In suppressing all of the statements from September 26, 1983, on, with the exception of the portion of the June 29, 1984 statement, the trial court stated that "the character of the relationship of the state police and the defendant changed in what the court believes is a constitutionally decisive way." Surveying the circumstances concerning those statements, the trial court found that, as of September 26, 1983, "heavy bargaining" began when the officers "explicitly stated" that they understood that the defendant would try to escape if allowed out of prison but that attempts would be made for this so that he could lead them to the evidence. This pattern of activity, the trial court found, was "aggressively pursue[d]" by the police over a long period of time as they tried "to deliver on a deal first suggested by the Defendant." In finding these statements involuntary, it also said that incriminating responses had been "impermissibly induced" over the period covering those statements.

In refusing to suppress that portion of the June 29, 1984 statement, the trial court said that while showing the picture to the defendant was interrogation, the circumstances, which the trial court analyzed, demonstrated that he "knowingly, understandingly, voluntar[ily] and effectively waived his *Miranda* rights and [that] the state [had] met its heavy burden in showing that." It also found that "the promises or attempts to strike a deal which necessitated the suppression of the statements after 9/21[/83] do not serve as a reason to suppress the Defendant's reaction to the display of a picture." In doing so, it indicated that in order "to find that a promise by the police requires an incriminatory statement to be held involuntary, it must be shown that the promise induced the statement." The "recurrent offers to take the Defendant out on the writ," could not be held, the trial court determined, to have induced the incriminatory responses that he allegedly made

when he saw the picture. Rather, the trial court reasoned that "one would think that the defendant would have had every reason not to show any recognition of the picture if he still hoped to keep up police interest in getting him out on the writ." Moreover, the trial court maintained that "concomitantly one would think the police would have had every reason not to so have shown him the picture if they wanted to secure more information from the Defendant." Therefore, it determined that the showing of the picture "was not part of the bargaining and offer of a benefit process" that it felt required the suppression of the other statements.[9]

In claiming that the trial court erred, the defendant argues that the nonsuppressed portion of the June 29, 1984 statement was involuntary and contends that there was no temporal attenuation between the police conduct from September 26, 1983, onward and the June 29, 1984 statement. He stresses that suppression was granted of all the statements between those dates and, indeed, also as to the balance of his June 29, 1984 statement and his later statement of July 11, 1984, because they were rendered involuntary by the conduct of the police from September 26, 1983, on. In addition, he argues that there was no " 'break in the stream of events . . .' " referring to *Darwin* v. *Connecticut*, 391 U.S. 346, 350–51, 88 S. Ct. 1488, 20 L. Ed. 2d 630 (1968), between all of the statements found involuntary and that portion of his June 29, 1984 statement found to be voluntary, that could support the challenged ruling. The state, on the other hand, argues that there was a meaningful temporal attenuation between the statement found voluntary and those that were not. It also claims that the record demonstrates significant intervening circumstances between the June 29, 1984

---

[9] At this time, the trial court said: "In making this ruling the Court is assuming the body was located solely as a result of the direction given Ewalt at the New Haven Jail, or in the 9/12 or 9/21 conversations."

statement that was found voluntary and all those that were not. These circumstances, it maintains, point to the lack of taint of the June 29, 1984 statement by the prior involuntary statements. The state, in addition, argues that any "alleged illegality" by the police did not overbear the defendant's will and violate his rights.[10]

The use of an involuntary confession in a criminal trial is a denial of due process of law. *Mincey* v. *Arizona,* 437 U.S. 385, 398, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *Jackson* v. *Denno,* 378 U.S. 368, 376, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964); *Culombe* v. *Connecticut,* 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961); *State* v. *Shifflett,* 199 Conn. 718, 727, 508 A.2d 748 (1986). It is the burden of the state to prove the voluntariness of a confession by a fair preponderance of the evidence. *Lego* v. *Twomey,* 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); *State* v. *Chung,* 202 Conn. 39, 48, 519 A.2d 1175 (1987); *State* v. *Stankowski,* 184 Conn. 121, 131, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981). In *State* v. *Shifflett,* supra, 727–28, we pointed out: " 'We have stated that " ' "the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of 'law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . .' *Rogers* v. *Richmond,* 365 U.S. 534, 544 [81 S. Ct. 735, 5 L. Ed. 2d 760] (1961)." ' " *State* v. *Staples,* [175 Conn. 398, 408, 399 A.2d 1269 (1978)];

---

[10] On this branch of its claim, the state's brief recognizes that it is challenging the trial court's finding that all the defendant's statements made between September 26, 1983, and May 1, 1984, were involuntary. It also acknowledges that it filed an untimely motion to file a statement under Practice Book § 4013 to "present this alternative theory" to this court. That motion was granted. Because we find no error in the trial court's ruling on the June 29, 1984 statement, we need not discuss the state's alternative theory.

see *State* v. *Derrico,* [181 Conn. 151, 163, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980)]. "The ultimate test remains . . . 'Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.' " *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) . . . .' *State* v. *Stankowski,* [supra, 132]." *State* v. *Derrico,* supra, 161. The determination, by the trial court, whether a confession is voluntary must be grounded upon a consideration of the circumstances surrounding it. *State* v. *Chung,* supra, 48; *State* v. *Carter,* 189 Conn. 611, 622, 458 A.2d 369 (1983); *State* v. *Derrico,* supra, 165.

This determination of voluntariness and admissibility, in the first instance, is a question of fact for the trial court to resolve in the exercise of a legal discretion in accordance with constitutional standards of due process. *State* v. *Derrico,* supra, 162–63. This, of course, includes decisions on questions of credibility presented to the trial court. *State* v. *McCarthy,* 197 Conn. 247, 258, 496 A.2d 513 (1985). "Though the question is ultimately factual, our usual deference to factfinding by the trial court is qualified on the question of voluntariness by the necessity for an independent and scrupulous examination of the entire record to ascertain whether the trial court's finding is supported by substantial evidence." *State* v. *Smith,* 200 Conn. 465, 478, 512 A.2d 189 (1986); *State* v. *Chung,* supra, 54.

Even under "the totality of circumstances test," a confession may not be "obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . ." *Hutto* v. *Ross,* 429 U.S. 28, 30, 97 S. Ct. 202, 50 L. Ed. 2d 194 (1976), quot-

ing *Bram* v. *United States,* 168 U.S. 532, 542–43, 18 S. Ct. 183, 42 L. Ed. 568 (1897); *Brady* v. *United States,* 397 U.S. 742, 753, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970); *State* v. *McCarthy,* supra, 256; C. McCormick, Evidence (3d Ed.) pp. 376–81. Where, as here, we consider an incriminating response found voluntary and admissible after a number of such prior statements have been found to be involuntary, we have said in a related context: " '[W]here the prosecution seeks to use a confession . . . uttered after an earlier one not found to be voluntary, [it] has the burden of proving that the second confession was not a product of improper threats or coercion and that it was not directly produced by the existence of the earlier confession.' *Darwin* v. *Connecticut,* [supra, 350–51] (Harlan, J., concurring in part and dissenting in part). See *United States* v. *Bayer,* 331 U.S. 532, 540–41, 67 S. Ct. 1394, 91 L. Ed. 1654 (1947); *State* v. *Darwin,* 161 Conn. 413, 425, 288 A.2d 422 (1971). Not every confession that follows an invalid admission of criminal involvement is a tainted product of the earlier statement. *United States* v. *Bayer,* supra, 539–41; *State* v. *Darwin,* supra, 425. Whether the second confession is a result of the prior confession and therefore inadmissible is to be determined 'in view of the totality of the circumstances, considering especially whether there was a break in the stream of events between the two statements.' *Darwin* v. *Connecticut,* supra, 350–51; *Clewis* v. *Texas,* 386 U.S. 707, 710, 87 S. Ct. 1338, 18 L. Ed. 2d 423 (1967); *Tanner* v. *Vincent,* 541 F.2d 932, 936 (2d Cir. 1976), cert. denied, 429 U.S. 1065, 97 S. Ct. 794, 50 L. Ed. 2d 782 (1977)." *State* v. *Derrico,* supra, 165–66. Later, in *State* v. *Shifflett,* supra, 741, we recognized that "[i]n assessing the causal connection between an involuntary statement and a subsequent confession, courts have considered the temporal proximity of the illegality and the confession, the presence of intervening circumstances, and the fla-

grancy of the official misconduct." See *Brown* v. *Illinois,* 422 U.S. 590, 603–604, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975); *State* v. *Ostroski,* 201 Conn. 534, 547, 518 A.2d 915 (1986).

Our analysis of the validity of the trial court's finding of voluntariness begins with the concession of the defendant in his brief that "the remains of the victim [Laura Hill] were located by the police as a result of information independent of [his] statements of September 21, 1983—July 11, 1984." We realize that in doing so, he also argues that this is not dispositive because, while conceding the source of the information leading to the discovery is important, he nevertheless maintains that the main concern is that he made a statement expressing recognition when shown photos of the grave site. The application to the challenged ruling of the three factors elucidated in such cases as *Brown* v. *Illinois,* supra, and *State* v. *Shifflett,* supra, in the totality of the circumstances in this case is thus helpful in our inquiry of the defendant's challenge of the trial court's ruling.

First, there was a significant temporal attenuation between the defendant's other suppressed statements and that of June 29, 1984. There had not been any meeting or interview between the state police and the defendant for almost two months prior to June 29, 1984. It is true that the police themselves continued to try to obtain a writ of habeas corpus in order to get the defendant out of prison to help them to locate Laura Hill's body and clothing as well as to lead them to the clothing of another homicide victim. The police, however, after the meeting of May 1, 1984, and prior to June 29, 1984, located the Hill grave site based on information wholly independent of any statements illegally obtained from the defendant. The passage of almost two months in this case is far longer than the approximate twenty-four hour period in *Shifflett* and the

approximate thirty-six hour period in *Ostroski,* both of which we found constituted a sufficient temporal attenuation under the circumstances. As we pointed out earlier, the challenged ruling goes to the defendant's response to the photos which occurred at the very beginning of the June 29, 1984 interview and just after he had received, understood and validly waived his *Miranda* warnings. While not conclusive, "[t]he fact that a suspect chooses to speak afer being informed of his rights is, of course, highly probative." *Oregon v. Elstad,* 470 U.S. 298, 318, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985). The circumstance that the balance of his June 29, 1984 interview was suppressed, as was his later interview of July 11, 1984, does not require or contribute to requiring suppression of the voluntary portion of the June 29, 1984 interview.[11] The temporal attenuation served greatly to dissipate the involuntary and induced nature of the other suppressed statements.

---

[11] In pressing his claim of error, the defendant contends that not only did his June 29, 1984 statement follow a series of statements found to have been obtained illegally, but also that the trial court suppressed the balance of his statement of June 29, 1984, as well as his later one of July 11, 1984. As to these last two statements, we note that the trial court did not undertake any specific analysis as to what statements were obtained on those two occasions as it had done at length as to the pre-June 29, 1984 statements it ordered suppressed. It is true that it did point out, as it did regarding the earlier suppressed statements, that on June 29, 1984, the police did not abandon the "tantalizing prospect" of obtaining a writ to take the defendant out to get further information. Even the defendant's brief as to the June 29, 1984 interview can refer only to his "offer" to help the police locate Laura Hill's clothing and help with information on other cases once he knew that the police had discovered Hill's remains.

As to the July 11, 1984 statements ordered suppressed, the trial court did not refer to any specific incriminatory statement the defendant made. Again, the defendant's brief refers only to a discussion of certain discrepancies claimed by the defendant as to the inventory of items in his van. It would appear, however, that from September 26, 1983, through July 11, 1984, the police had endeavored to keep the defendant cooperative to obtain information not only on the Laura Hill case but on other matters.

In any event, we cannot attach the significance claimed by the defendant to the suppression of the balance of his June 29, 1984 statement and that of July 11, 1984, both later in time, to his statement given at the very start of the interview of June 29, 1984.

The presence of intervening circumstances is clearly evident here. The discovery of the skeletal remains of Laura Hill on June 27, 1984, was a significant "break in the stream of events." See State v. Derrico, supra, 166. The remains were concededly located by information from the defendant himself wholly independent of any of the police conduct that caused the court to suppress the other statements. This discovery undermined the defendant's ability to bargain from strength, as previously, with the police to get him out. The claimed suppressible response to the photos all but disappears when one considers this discovery of the grave site in confluence with a number of relevant factors. Some are that the defendant validly told authorities where the body was, and its location was memorialized by a map drawn and detailed under his supervision. In addition, as the trial court correctly opined, his actual response to the photos could not be attributed to the hitherto "recurrent offers" of the police to get him out because it would have been entirely reasonable not to expect him to show any recognition at all if he still had hopes of getting out.[12] This is supported by the consideration, as the trial court observed, that it would also be reasonable to believe that the police would *not* have shown him the picture if they had wanted to get more information from him about Laura Hill. In the totality of the circumstances, because the discovery of the victim's body naturally led to a change in the character of the police bargaining with the defendant, there was a "break in the stream of events."

The component of the "flagrancy" of police misconduct which finds sufficient support both in the evidence and on relevant legal principles for the trial court's suppression of all of the other statements, was properly

---

[12] There is no indication that the defendant ever showed the police where Laura Hill's clothing was to be found or that the police ever, in fact, found her clothing.

found lacking as to the challenged ruling. The trial court found that the "recurrent offers" to take the defendant out on a writ could not be found to have induced the defendant to respond as he did to the picture. It determined that the showing of the pictures was "not part of the bargaining and offer of a benefit process" which required the suppression of other statements.[13] The record supports these determinations in the light of the totality of the circumstances. To make such a response involuntary, there would have had to be present the confluence of a promise or promises and a confession obtained thereby; this was not the case.[14] See, e.g., *United States* v. *Robinson,* 698 F.2d 448, 455 (D.C. Cir. 1983).

The ultimate question of whether a defendant's will has been overborne, thus resulting in an involuntary statement in a particular case, involves, as noted, an assessment of the totality of all the surrounding circumstances—both the characteristics of the accused

[13] Although the trial court did not explicitly refer to *Wong Sun* v. *United States,* 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963), it appears that it implicitly determined that the "taint" of the suppressed statements had no unconstitutional nexus with the June 29, 1984 statement which it found voluntary and admissible.

[14] In ordering suppression of the defendant's post-September 21, 1983 statements for the reasons given, the trial court specifically observed that "this is not . . . *Oregon* v. *Elstad,* [470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985),] a situation where seriatim confessions may be held admissible after proper *Miranda* warnings where a prior confession was invalidated because of a technical failure to comply with the *Miranda* rules. Here the Court finds the statements after 9/21 were involuntary and the improper inducements . . . continue[d] from 9/26 onward . . . ."

We agree with the trial court that this was not an *Oregon* v. *Elstad* situation. In *Elstad,* the United States Supreme Court said: "We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Oregon* v. *Elstad,* supra, 318. In reaching that determination, it also said: "Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." Id., 309.

and the details of the interrogation. *Schneckloth* v. *Bustamonte,* supra, 226. Some of those also taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. Id.; *State* v. *Toste,* 198 Conn. 573, 584, 504 A.2d 1036 (1986). As to the June 29, 1984 statement under attack, the trial court specifically found that the defendant had been fully advised of his rights and had made a constitutionally valid waiver of his *Miranda* rights and, even prior to being advised of his rights, had signed a prison form indicating that he was willing to talk to the officers. It found that, at that time, the defendant "was calm, rational, friendly, no threats were made, he didn't seem to be suffering from pain, [and] he wasn't restrained."[15] Earlier in its oral decision, it found that the defendant had had "extensive prior contact with the law" so that he understood his rights. With reference to an earlier interview, the trial court said that the defendant had appeared "to be articulate and intelligent." During the interviews with the state police from September 26, 1983, through July 11, 1984, he was in custody in Somers for a sentence in an unrelated crime, so he was hardly in "custody" specifically for these interviews. The defendant was not even required to speak to the police but voluntarily did so.

The trial court's ruling was not in error. It was supported by substantial evidence and grounded on principles of the applicable law.

There is no error.

In this opinion the other justices concurred.

---

[15] Although there is no such finding, the court file indicates that the defendant was born in 1954.