[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION TO SUPPRESS
The defendant in this case, Derek Roseboro, is charged with the murder of three persons at a residence in Derby on Friday evening, August 11, 1989. The defendant was arrested at the Yale New Haven Hospital on the evening of August 27, 1989 before he was taken to the operating room for surgery on self-inflicted knife wounds. (See police report, exhibit 2). The defendant has moved to suppress all the statements made by the defendant from August 27, 1989 through September 8, 1989, on the ground that all of them were involuntary as a result of the defendant's physical condition at the time, that the first two statements on August 27, 1989 were made without the defendant first being advised of his Miranda rights, and that the subsequent statements were all tainted or effected by the initial statements. The defendant also CT Page 3179 moves to suppress a tea cup found by the state police on a dead end street in Ansonia on August 29, 1989, and an umbrella obtained from the defendant's locker on August 28, 1989 at Carlon Products on Water Street in Derby. Before discussing the claims of the State and the defendant on whether or not the statements and the two pieces of evidence should be suppressed, some discussion of the evidence produced at the hearing on the motion to suppress is essential.
On August 12, 1989, the Derby Police were informed of the apparent murder of three members of the Ferrara family at a house on Emmett Avenue in Derby. Members of the major crime squad of the Connecticut State Police, including Detectives Charles Revoir and Martin White were called in to assist the Derby Police with the investigation. The defendant, who lived at 222 Emmett Avenue near the crime scene, was questioned by the police on the afternoon of August 15, 1989. In that interview Roseboro was asked by Detectives Kraus and Libby, also of the Connecticut State Police, about his activities on Friday night, August 11th and Saturday August 12th, 1989. The officers observed that the defendant's left forearm and hand were swollen, that there was a cut on his right hand and numerous track marks on both of his arms. After being questioned the defendant was dropped off at about 3:00 p.m. at Carlon Products where he worked. The state police then obtained a search and seizure warrant and served it on Roseboro at Carlon Products at about 9:00 p.m. Roseboro was advised of his constitutional rights and taken to Derby Police Headquarters where he was questioned and photographed.
During the interview the defendant told the police that he had a locker at work where he kept work clothes and other personal effects. The defendant consented to a search of the locker and signed a consent form dated August 15, 1989 (Exhibit E) which authorized Detectives Coffey and Revoir to search Locker #6 at Carlon Products and take personal property in the locker. After the consent form was signed, the police took Roseboro to Griffin Hospital where a blood sample was taken based upon the search and seizure warrant. Roseboro was then driven to Carlon Products were he opened the locker. It was searched by Coffey and Revoir and work pants and a shirt with stains on them were taken. The police then returned the defendant to his residence in Derby. Roseboro denied involvement in the crime during the questioning on August 15, but remained a suspect.
At about 5:30 p.m. on August 27, 1989 Deborah Gorzelany and Deborah Hanley went to the New Haven Police Department with a complaint that they had been detained and assaulted by CT Page 3180 Roseboro less than one hour earlier at a garage on Humphrey Street in New Haven. Gorzelany was Roseboro's girlfriend. The complaint stated that Roseboro had a gun, pointed the gun at Hanley and said he was going to kill her, and that he struck Gorzelany and ripped her shirt. The two women managed to escape in a car and went directly to Police Headquarters. Detective Sargeant Michael Sweeney (N.H.P.D.) knew that Roseboro was one of the suspects in the Derby murders, and called the Derby Police Department. Detective White of the Connecticut State Police (C.S.P.) and Detective Marcel LaJeunesse of the Derby Police Department (D.P.D.) immediately went to the N.H.P.D. They then went with Sweeney to the Humphrey Street area. When they arrived there Sgt. Anthony Griego was at the scene, and he indicated that just before their arrival a burglar alarm had gone off in the house at 420 Humphrey Street. Detective Christopher Grice (N.H.P.D.) had seen a black man in the house. The police believed it was Roseboro. The front door of the house was kicked in and Sweeney, Griego, officers Wortz and Bicki, and a dog entered the house. After searching the first floor, they went to the second floor and kicked in the door of a bedroom. They saw the bathroom door closing. The bathroom door was also kicked in, the dog entered first and grabbed the defendant's leg. Sweeney entered the bathroom with his gun drawn, followed by some of the other officers. Roseboro was on his back in the bathtub with a large butcher knife in his hand and was bleeding profusely from his chest area. Sweeney removed the butcher knife from Roseboro's hand and applied two towels to his chest in an attempt to stop the bleeding. After the man admitted that he was Derek Roseboro Sweeney began questioning him without giving any Miranda type warnings. Sweeney thought the defendant was dying and Roseboro acknowledged that he was dying and had no hope of recovery. Sweeney had put his gun away and was not in uniform, but the defendant knew that Sweeney and the other persons present were police officers. Sgt. Griego and Officer Bicki were in uniform. Roseboro was not handcuffed or placed under arrest at the time.
After ascertaining Roseboro's identity and his belief that he was dying, Sweeney immediately questioned him about responsibility for the killings in Derby. Sweeney claims that Roseboro's first statement was "I did it" but this apparently was not heard by the other police officers present and Roseboro immediately said that Gorzelany had done it, a position adhered to in later interrogations. He was questioned about what happened, a weapon involved in the murders and whether they had taken anything from the house. Roseboro said they took a tea cup to put their cocaine in and that it was off of a circle near a dirt path. CT Page 3181
When the ambulance arrived Roseboro was removed on a stretcher from the bathtub and the house and placed in the ambulance. Roseboro was not told that he was under arrest for the Derby murders or the earlier incident at the garage on Humphrey Street or for entering the house.
Sweeney conferred with LeJeunesse and White about what had occurred in the house and told them to ride in the ambulance and question Roseboro. LeJeunesse and White rode in the ambulance with Roseboro and the attendants to the Yale New Haven Hospital. They asked Roseboro to talk about the homicides in Derby during the ambulance ride and Roseboro seemed to understand their questions. There was no warrant for Roseboro's arrest for the Derby offenses, and LaJeunesse did not know the details of the prior offenses in New Haven. They did not place Roseboro under arrest and did not intend to arrest him. During the questioning in the ambulance Roseboro discussed a newspaper dated August 12, 1989 which was found at the scene of the crime, and stated that he and Gorzelany had taken a tea cup out of the house and described its location. He maintained that Gorzelany had done the murders after both of them had shot drugs on the evening of August 11th near the crime scene.
After Sweeney arrived at the hospital he was informed by the Emergency Room doctor that Roseboro was not going to die and that as soon as he was stabilized Sweeney could talk to Roseboro. Sweeney seized all the clothing that Roseboro was wearing, and after advising him of his constitutional rights took a rambling statement from him on a tape recorder provided by another officer while Roseboro was being worked on by doctors and nurses. Sweeney then requested that a 24 hour guard be placed on Roseboro. LaJeunesse and White were present during this interview prior to the operation on the defendant during the early evening hours of August 27, 1989. Roseboro understood where he was and initially agreed to give a statement. The first few minutes of questioning were uneventful, but Roseboro indicated again that he didn't do anything and that he did not know what happened. He then indicated "I'm not answering . . . that's enough. That's all you need to know. Come back tomorrow." (Exhibit K, p. 3). Questioning nevertheless continued, and Sweeney continued to urge Roseboro to keep talking while Roseboro was being prepared to go the operating room. Additional statements were obtained.
After the operation was over and Roseboro was in the recovery room, the police questioned him again after obtaining permission from hospital personnel. The time of CT Page 3182 this questioning was in the late evening hours of August 27, 1989 or the early morning hours of August 28, 1989. Before this interview Roseboro was asked to sign a waiver of rights form (Exhibit I) which he did with great difficulty. Roseboro indicated that he understood his rights. Prior to questioning a recovery room nurse asked him a series of questions to determine if he was alert and lucid. Sweeney, White and LaJeunesse testified that Roseboro understood the warnings and was willing to be questioned. Roseboro said he would only talk about the murders for five minutes. He said that he entered the house a few minutes behind Gorzelany and that the killings occurred because she was in a frenzy after taking the drugs which Roseboro had given her. Roseboro said that when he entered the house Mrs. Ferrara was on the floor in the hallway and there was a lot of blood. He stated that he and Gorzelany cleaned up, got blood on their clothing and that they had to use a chemical cleaner to get the blood stains off the door handles of Gorzelany's car. He also indicated that he had gone back Saturday morning to clean up.
The next questioning occurred at about 9:15 a.m. on August 28, 1989. After giving Roseboro a warning of his rights, LaJeunesse and White questioned him. Roseboro again indicated that Gorzelany was high on cocaine and that when he entered the house Gorzelany was standing there, but had nothing in her hand and no blood on her. Mrs. Ferrara was lying dead in the hallway but Roseboro did not see anyone else. Roseboro claims that they discussed calling an ambulance but forgot when they left the house. (Exhibit V, transcript of interview).
On the same day, August 28, the tea cup was found about 12 feet from the curb of a cul-de-sac at the end of Edgewood Avenue in Ansonia, a short distance from Route 8 and the Ferrara house. This was one day after Roseboro made statements about the location of the tea cup and that he and Gorzelany had removed it from the house. The State and the police contend that there was an ongoing search in the area of the crime, and that they were planning to search the Edgewood Avenue area eventually.
On August 29, 1989 White and LaJeunesse conducted two further interrogations of the defendant, at 9:00 a.m. and 4:00 p.m. (Exhibits X and Z). Roseboro was warned of his rights before this and any subsequent interrogations. He drew three diagrams which are hard to decipher when talking with the police. Roseboro was shown a picture of the tea cup but said he did not recognize it. He was told that the police found it in the woods at the end of the dead end road by the circle. He again maintained that he had only seen Mrs. CT Page 3183 Ferrara's body in the house. At times Roseboro denied taking the tea cup from the house.
At about 1:30 p.m. on August 29, LaJeunesse and White went to Carlon Products. Roseboro remained in the hospital and did not know about the search at the time. The officers said the locker was open and unlocked. They made an inventory of the contents and seized about ten items including clothing and an umbrella. They went back to the hospital and questioned the defendant again at about 4:00 p.m., asking questions about the tea cup and what Roseboro saw in the Ferrara house after he followed Gorzelany inside. More interrogation occurred on August 30 at about 6:30 p.m. and August 31 at about 2:30 p.m. Roseboro was also advised of his rights before those interviews which were not recorded and apparently yielded little if any new information. On September 2, 1989 at about 6:20 p.m. White and LaJeunesse again interviewed the defendant at the hospital after warning him of his rights. The questioning primarily concerned clothing Roseboro and Gorzelany were wearing when they were in the Ferrara house and their efforts to clean up after that. The next interview was September 8, 1989 at about 2:00 p.m. when two detectives from the Connecticut State Police spoke with the defendant at the hospital. Evidence at the hearing did not indicate what occurred during that interview. Roseboro was officially arrested on September 13, 1989, for the Derby murders although there had been a 24 hour guard provided by the police from the time Roseboro entered the hospital. The record did not indicate what he was arrested for on August 27th.
1. Burden of Proof on Issues Raised
Section 821 of the Connecticut Practice Book allows the defendant to file a motion to suppress potential testimony or other evidence when suppression is required under the Constitution or laws of the United States or the State of Connecticut. Under section 822 and section 54-33f of the General Statutes the defendant can also file a motion to suppress evidence obtained without a warrant where a warrant was required. The initial burden of going forward on a pre trial motion to suppress is on the defendant, but the burden of proof is on the State on the most of the issues governing whether confessions or evidence obtained by the State should be suppressed.
Where a defendant makes a confession, the burden is on the state to prove the voluntariness of the confession by a fair preponderance of the evidence. Lego v. Twomey, 404 U.S. 477,489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); State v. CT Page 3184 Schroff, 206 Conn. 182, 195 (1988); State v. Chung, 202 Conn. 39,48 (1977).
The state also has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his rights under Miranda Arizona, 384 U.S. 436, 475, 478, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966). State v. Northrop, 213 Conn. 405, 417 (1990); State v. Hernandez, 204 Conn. 377, 395 (1987); State v. Chung, supra, 48. Proof beyond a reasonable doubt is not required. State v. Madera, 210 Conn. 22, 49 (1989). Since voluntariness of a confession only has to be established by a preponderance of the evidence, a waiver of the auxiliary protections established in Miranda do not require a higher burden of proof. Colorado v. Connelly, 107 S.Ct. 515 (1986).
Before an individual suspected of a crime is entitled to the protection of Miranda warnings, two conditions must be satisfied: (a) the suspect must be in the custody of law enforcement officers; and (b) he must be subjected to interrogation by the police. State v. Hoeplinger, 206 Conn. 278,286 (1988); State v. Copeland, 205 Conn. 201, 206
(1987). The defendant has the initial burden of proving custodial interrogation. State v. Pittman, 209 Conn. 596, 606
(1989); State v. Doehrer, 200 Conn. 642, 647 (1986); United states v. Charles, 738 F.2d 686, 692 (5th Cir. 1984).
Where a defendant claims that the state has obtained evidence by an illegal search and seizure, the defendant has the burden of proving first that he had an actual subjective expectation of privacy in the place searched, and second that his expectation was constitutionally reasonable under the circumstances; to determine this, the court considers all relevant circumstances. State v. Brown, 198 Conn. 348, 356
(1986); State v. Cooper, 9 Conn. App. 15, 20 (1986). See also California v. Ciraolo, 476 U.S. 207, 211 (1986); Rawlings v. Kentucky, 448 U.S. 98, 104 (1980).
Where the state claims there was consent to a search, it must affirmatively establish by a preponderance of the evidence that the consent was in fact freely and voluntarily given. State v. Jones, 193 Conn. 70, 79 (1984); State v. Van Der Werff, 8 Conn. App. 330, 341 (1985).
2. Statements in the house in New Haven
The defendant claims that the statement made to Sweeney at 420 Humphrey Street in New Haven should be suppressed on two grounds: (1) No Miranda warnings were given to the defendant before the statement was made, and (2) the CT Page 3185 statement was involuntary. Prior to the Miranda decision in 1966, the admissibility of an accused as in custody statements were judged solely by whether they were "voluntary" within the meaning of the due process clause of the U.S. Constitution. Oregon v. Elstad, 470 U.S. 298, 304,105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); Haynes v. Washington,373 U.S. 503 (1963). The Fifth Amendment, irrespective of Miranda, prohibits the state from using an involuntary confession at trial. State v. Barrett, 205 Conn. 437, 451
(1987); State v. Shifflett, 199 Conn. 718, 727. Both theFifth andFourteenth Amendments of the United States Constitution and Article First, Section 8 of the Connecticut Constitution require Miranda warnings for statements made by a defendant to be admitted in evidence in prosecutions in state courts. State v. Barrett, supra, 447; State v. Chung, supra, 45 n. 7. The Miranda ruling requires suppression of many statements that would have been admissible under a traditional due process analysis by presuming that statements made while in custody and without adequate warnings are protected by the Fifth Amendment. Oregon v. Elstad,470 U.S. at 304. The purpose of the required Miranda warnings is to counteract the coercive atmosphere attendant upon custodial interrogation, to give added protection to the privilege against compulsory self-incrimination under theFifth Amendment, and to reduce the risk of involuntary statements. Colorado v. Spring, 479 U.S. 564, 572, 574 (1987); Connecticut v. Barrett, 479 U.S. 523, 528 (1987); State v. Doehrer, 200 Conn. 642, 646 (1986). Miranda warnings do not create a separate constitutional protection, but rather their function is to act as procedural safeguards to secure or insulate the Fifth Amendment privilege against compulsory self-incrimination from the inherently compelling pressures of custodial interrogation. Colorado v. Spring,479 U.S. at 572, 574; Connecticut v. Barrett, supra, 479 U.S. at 528. Accordingly, the requirements of Miranda and theFifth Amendment, while related, are separate, and for a confession to be admissible it must meet the Miranda requirements and be voluntary. A statement may be made in violation of the Miranda requirements even though it is otherwise voluntary and otherwise admissible at trial. "A Miranda violation does not constitute coercion but rather affords a bright line legal presumption of coercion requiring suppression of all unwarned statements." Oregon v. Elstad, 470 U.S. at 307n. A failure to administer Miranda warnings is not in itself a violation of the Fifth Amendment. New York v. Quarles,467 U.S. 649, 654 (1983); Michigan v. Tucker, 417 U.S. 433, 444
(1974); Oregon v. Elstad, 470 U.S. at 307.
Under Miranda v. Arizona, 384 U.S. 436, 479, before a suspect can be subjected legally to custodial interrogation CT Page 3186 he must be advised: (1) of his right to remain silent; (2) that anything he says can be used against him in a court of law; (3) that he has the right to the presence of counsel; and (4) if he cannot be afforded the services of an attorney one will be appointed for him prior to any questioning if requested. The State concedes that neither Sweeney nor anyone else gave Roseboro any Miranda warnings prior to the questioning of Roseboro by Sweeney. The State contends: (1) Roseboro was not in custody so that Miranda warnings were not required, (2) questioning was allowed under a Terry stop, and (3) the emergency nature of the situation confronting the police, namely that Roseboro was apparently bleeding to death in the bathtub, allowed his interrogation under the public safety exception to the Miranda rule.
(a) public safety claim
The public safety exception claim is easily disposed of. This claim is based on New York v. Quarles, 467 U.S. 649, where a police officer responded to a complaint of a crime and a description of an assailant and stopped a defendant; after noticing an empty shoulder holster and handcuffing the suspect, the officer asked him where the gun was, without first arresting him and reading him his Miranda rights. A narrow exception to the Miranda rule known as the "public safety" exemption was recognized, allowing questioning of a suspect where was there was concern for public safety. Where someone might later find a dangerous weapon, there was a legitimate concern for danger to the public from concealment of a gun in a public area. It is clear from New York v. Quarles, however, that the public safety exception is a narrow one. There have also been other cases, mostly from California, finding concern for a possible victim of a crime (known as the rescue doctrine) as justifying a violation of Miranda requirements. See 9 A.L.R. 4th 595. All of these cases concern a possible threat to the public at large or a crime victim. The same concerns do not apply, nor do the cases, to the criminal suspect himself. Even if such a rule did exist, it would not apply here. When Sweeney found the defendant bleeding in the bathtub, he immediately removed the butcher knife from the defendant's hand, neutralizing the only weapon at the scene. Moreover, the questioning that occurred without the Miranda warning did not involve discarded weapons at the scene, but rather questioning about a prior crime, the murders in Derby.
(b) Terry stop claim
The State also attempts to justify the questioning at Humphrey Street and in the ambulance on grounds that it was a CT Page 3187 Terry stop which did not require Miranda warnings. State v. Torres, 197 Conn. 620, 628. Under Terry v. Ohio, 392 U.S. 1,22 (1968) the police have the right to stop individuals suspected of criminal activity, question them briefly, and perform a limited search for weapons. See also State v. Jackson, 23 Conn. App. 151, 154. What occurred here was not a Terry stop. The stop and inquiry must be reasonably related in scope to the justification for their initiation. Terry v. Ohio, supra, 392 U.S. at 29. A Terry stop allows the officer who lacks probable cause for an arrest but whose observations lead him to reasonably suspect that a particular person has committed, is committing, or is about to commit a crime, to detain that person briefly in order to investigate the circumstances that invoke suspicion; this allows the officer to ask the detainee a moderate number of questions to determine his identity and to try to obtain information concerning or dispelling the officer's suspicions. State v. Torres, supra, 628. A Terry stop does not allow transportation of a suspect for open ended questioning. State v. Edwards, 214 Conn. 57, 73.
If the questioning by Detective Sweeney had been related to why Roseboro was in the house on Humphrey Street, the questioning may have been permissible, and excused Miranda warnings. However, the questioning was not about the apparent break-in or even the complaints of Gorzelany and Hanley, nor was it directed to search for weapons nearby. Sweeney already intended to arrest Roseboro, and the questioning centered on the Derby murders.
(c) custodial interrogation claim
In order for Miranda warnings to be required, (1) the suspect must be in the custody of law enforcement officers; and (2) he must be subjected to interrogation by the police. State v. Hoeplinger, 206 Conn. 278, 286; State v. Copeland,205 Conn. 201, 206. Interrogation for purposes of Miranda must reflect a measure of compulsion above and beyond that inherent in the custody itself. State v. Doehrer, supra, 647; Rhode Island v. Innis, 446 U.S. 291, 300, 100 S.Ct. 1682,64 L.Ed.2d 297 (1980). Interrogation covers both express questioning and any words and activities on the part of law enforcement officers, exclusive of those normally attendant to arrest and custody, that the officers should know or are reasonably likely to illicit an incriminating response from the subject. Rhode Island v. Innis, 446 U.S. at 301; State v. Hoeplinger, supra, 287 n. 6; State v. Copeland, supra, 207; State v. Graham, 186 Conn. 437, 443. The inquiry focuses primarily upon the perceptions of the suspect rather than the intent of the police. However, the test on whether a page 3188 particular question is reasonably likely to illicit an incriminating response is objective, and the relationship of the questions asked to the crime being investigated is highly relevant. State v. Evans, 203 Conn. 212, 226. Statements given freely and voluntarily by the suspect without any compelling influence and not related to the crime is not interrogation. State v. Copeland, supra, 207, 208. Also, strictly casual conversation between a custodial suspect and the police, with no discussion of the crime or crimes under the investigation is not interrogation. State v. Palmer,206 Conn. 40, 63; State v. Doehrer, supra, 647.
In this case Sweeney wasted no time in asking Roseboro about the Derby murders. The later questioning of Roseboro in the ambulance on the way to the hospital by White and LaJeunesse was also strictly directed to the Derby murders. While the initial burden of proving interrogation rests with the defendant, State v. Copeland, supra, 207, the interrogation requirement is clearly met on both occasions. Roseboro certainly knew that the police were attempting to get him to discuss his involvement in the crimes, and that his responses could be self-incriminating.
The State claims that since Roseboro was not arrested at the time of the bathtub and ambulance conversations that he was not in custody so that the requirement of Miranda warnings did not apply. The State is correct that Miranda can be invoked only when there is custodial interrogation. Beckwith v. United States, 425 U.S. 341, 346-47 (1976). This means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. Miranda v. Arizona, supra, 384 U.S. at 467; State v. Hoeplinger, supra, 286; State v. Brown, 199 Conn. 47, 51. A suspect is in custody only if, in view of all the surrounding circumstances, a reasonable person would have believed that he was not free to leave. United States v. Mendenhall,446 U.S. 544, 553-54 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); State v. Green, 207 Conn. 1, 6-7 (1988). The court looks at the totality of the circumstances of the questioning in order to determine whether a reasonable person would have construed those circumstances as placing him in a custody situation. State v. Hoeplinger, supra, 287. The ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. California v. Beheler, 493 U.S. 1121, 1125,103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); State v. Pittman,209 Conn. 596, 608. See discussion in 1 W. LaFave J. Israel, Criminal Procedure, section 6.6, Miranda: when interrogation is "custodial". Interrogation at a police station where a CT Page 3189 suspect has not been formally arrested is more apt to be found custodial than interrogation elsewhere, but where the questioning took place is not controlling.
While the defendant has the initial burden of proving custodial interrogation, State v. Pittman, supra, 606, in this case there was custodial interrogation when Sweeney questioned Roseboro at Humphrey Street. The following facts are significant. Both Roseboro and the police knew that Roseboro was a suspect in the Derby murders. He had previously been questioned, a blood sample taken and his locker had been searched. The police were after him for the incident less than an hour before the questioning. Gorzelany and Hanley had made a complaint about conduct of the defendant amounting to kidnapping and assault for which the New Haven police certainly intended to arrest Roseboro. They also intended to arrest him for charges resulting from his unauthorized presence at the house on 420 Humphrey Street. They broke down three doors in the house to reach Roseboro and apprehended him with a dog. Sweeney entered the bathroom with his gun drawn.
Roseboro might not have known that the police were after him for the incident involving Gorzelany and Hanley, but he knew that he had no right to be in the house. On that basis alone he was subject to charges of at least criminal trespass and possibly burglary in the third degree. He had a prior criminal record giving him some familiarity with police procedures. Even without the self-inflicted stab wounds, it clear to both Roseboro and Sweeney that Roseboro was not free to leave the premises. As a result of Roseboro's physical condition he could not leave anyway. Sweeney conceded that he was there to apprehend Roseboro, that Roseboro did not have a right to be there, and that he would have placed him under arrest if it were not for Roseboro's physical condition. There was no reason to handcuff him or formally arrest him at that time. Sweeney thought that Roseboro was going to die, and if not, he wasn't going anywhere except the hospital.
There was no requirement that Sweeney question Roseboro on the Derby murders at that time. While the reason he did so is understandable, the desire to solve a crime and belief that a material suspect was about to die, that does not avoid the Miranda warning requirements. The statements are not admissible in a trial which will occur because the defendant has now survived. The motion to suppress is granted as to all statements made by the defendant when he was in the bathtub at Humphrey Street. CT Page 3190
3. Statements made in the ambulance
There is no material difference with the statements made to White and LaJeunesse when they questioned the defendant in the ambulance on the way to the hospital. As a result of his physical condition, Roseboro could not have left the ambulance if he wanted to, but that is not controlling. White and LaJeunesse were called in by Sweeney because he intended to arrest Roseboro based on the complaints made to the New Haven police, and saw his arrest as an opportunity for further questioning on the Derby murders. Roseboro was in custody for purposes of Miranda warnings when he was in the house, and this situation did not change when he was removed from the house and placed in the ambulance. It was not customary procedure for police officers to go with suspects in an ambulance to the hospital. The officers did so because Sweeney wanted them to, and to question Roseboro. As far as Roseboro was concerned, he was no less in custody in the ambulance than he was previously in the house. Furthermore, in response to Sweeney's questions, Roseboro had already made statements which he knew were self-incriminating and could form the basis for an arrest for the Derby murders.
It is undisputed that neither White nor LaJeunesse advised Roseboro of his Miranda rights before questioning him in the ambulance. The defendant has shown custodial interrogation by at least a preponderance of the evidence.
The State relies on several cases which hold that there is no custodial interrogation when a police officer questioned a suspect at a hospital to which he was taken after a possible criminal violation. Among these cases are Berkemer v. McCarty, 468 U.S. 420 (1984) ; People v. Milhollin, 751 P.2d 43 (Colo. 1988); People v. Romano,139 Ill. App.3d 999, 487 N.E.2d 785 (1985); State v. Hoskins,292 Minn. 11, 193 N.W.2d 802 (1972); State v. Cain, supra,400 N.W.2d 582 (Iowa 1987); State v. Portigue, 125 N.H. 338,488 2d 896 (1984); United States v. Martin, 781 F.2d 671
(9th Cir. 1985). These cases and others on the subject turn on their own facts. Without extensive discussion of the cases relied upon by the State, they are distinguishable on several grounds, mainly because the questions asked by the police officer at the hospital in these other cases were preliminary and investigatory, and not designed to nail the person questioned with a confession. In some cases it was not clear that a criminal offense had occurred or the person questioned was not a clear suspect. Most of these cases involved investigation of traffic accidents.
In fact, the hospital interrogation cases go both ways. CT Page 3191 See "What constitutes `Custodial Interrogation' within rule of Miranda v. Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation," section 13, 31 A.L.R.3d 565, 620-625. For example, in State v. Johnston, 406 N.W.2d 794 (Iowa App. 1987), interrogation of a robbery suspect by an animal control officer while the suspect was at a hospital for treatment of a dog bite injury was found to be custodial interrogation. Material facts were that he was a suspect, he had run away from the crime scene, the interrogating officer knew of the robbery charge, and the suspect was guarded by two police officers. In People v. Romano, supra, 792, several factors were considered in determining whether there was custodial interrogation: (1) the place of the interrogations; (2) any statements or non verbal conduct indicating an accused is not free to leave; (3) the extent of the knowledge of the police officers and the focus of their investigations; (4) the intentions of the police officers; and (5) the objective circumstances surrounding the investigation to determine whet a reasonable men innocent of any crime would perceive. While in Romano, there was no custodial interrogation despite questioning by a police officer at a hospital, under these factors it is clear that the questioning of Roseboro in the ambulance was custodial interrogation. United States v. Martin, supra, 673, also relied upon by the State, recognizes that in some cases an individual held for medical treatment in a hospital can be considered "in custody". It is clear that a defendant does not have to be questioned at police headquarters in order to be considered in custody for purposes of requiring Miranda warnings. Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 1097
(1969); (defendant questioned in his bedroom as to presence at homicide scene and ownership and location of a pistol).
The motion to suppress is granted as to all statements in the ambulance.
4. First interrogation at the hospital
Roseboro was questioned by Sweeney shortly after he arrived at the hospital, when doctors and nurses were stabilizing Roseboro and preparing to take him to the operating room. After giving Roseboro the standard Miranda warning, including the right to remain silent, Sweeney questioned him. After a few minutes Roseboro said "I'm not answering. That's enough. That's all you need to know. Come back tomorrow." The defendant claims that further questioning was improper and that the rest of that statement should be suppressed. As stated in Miranda v. Arizona, 384 U.S. at 473,474, and quoted in State v. Shifflett, 199 Conn. at 738, 739; CT Page 3192
 "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment
privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked."
The question is whether the defendant invoked his right to remain silent with his statement. State v. Usry, 205 Conn. 298,308. In State v. Klimczak, 159 Conn. 608, 610, a statement of "don't bother me," was held to be sufficient to invoke the defendant's Fifth Amendment privilege. In State v. Usry, supra, 308, in response to a question whether he wished to make a statement, the defendant said that he "had nothing to make a statement about." In State v. Jones, 193 Conn. 70,82, the defendant said "I don't want to answer that right now." The court concluded that neither statement was an invocation of the right to remain silent requiring termination of the interview. In Jones, the court noted that the defendant did not state that he did not wish to answer any question at all, and that other questions were asked without objection. Id., 83. By way of contrast, in Christopher v. Florida, 824 F.2d 836 (11th Cir. 1987) it was held that "I got nothing else to say" was an unequivocal statement that the defendant did not want to answer more questions. The defendant's statement at the hospital was an attempt to end questioning, at least as unequivocal as the statement in State v. Klimczak, supra.
Once an accused in custody invokes the right to remain silent, interrogation must stop, and his right to remain silent must be "scrupulously honored," as required by Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321,46 L.Ed.2d 313 (1975). State v. Usry, supra, 308; State v. Shifflett, supra, 739. Campaneria v. Reid, 891 F.2d 1014,1021 (2nd Cir. 1989).
In this case it should also be kept in mind that the defendant's will to resist questioning was affected by his weakened physical condition and the fear that he was going to CT Page 3193 die. The statement taken after the defendant invoked his right to remain silent is inadmissible even though he did continue to answer more questions without sufficient police coercion to make the statement involuntary. State v. Shifflett, supra, 739, 740. The portion of the statement made after the Miranda warning and before the defendant asked questioning to stop is admissible.
5. Whether any of the statements were involuntary
The defendant also claims that all his statements were involuntary whether or not he was given Miranda warnings. This claim applies to the bathtub and ambulance statements, as well as all questioning at the hospital. Determining this issue is material not only on admissibility of the statements, but also on whether evidence obtained as a result of them, mainly the tea cup, can be used at the trial.
As previously discussed, voluntariness of a statement or confession is a different issue from whether the defendant was given Miranda warnings before making it. The test for voluntariness is whether, considering the totality of the surrounding circumstances, the conduct of law enforcement officers was sufficient to overcome the suspect's will to resist and thereby causing an involuntary response, namely one that was not freely self-determined. State v. Barrett,205 Conn. 437, 451-52; State v. Chung, supra, 53, 54; State v. Smith, 200 Conn. 465, 477; State v. Shifflett, supra, 727, 728; Rogers v. Richmond, 365 U.S. 534, 544, 81 S.Ct. 735,5 L.Ed.2d 760 (1961).
The State has the burden of proving the voluntariness of a confession by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473
(1986); State v. Chung, supra, 53; State v. Barrett, supra, 451, 452. Unless that burden is met, a confession compelled by pressure from a police officer is inadmissible for any purpose. Id., 452; Mincey v. Arizona, 437 U.S. 385, 398,98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). "Coercive police activity is a necessary predicate to the finding that a confession is not `voluntary' within the meaning of the due process clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. at 167; State v. Barrett, supra, 452. In Colorado v. Connelly, supra, the court reasoned that because the sole concern of the Fifth Amendments privilege against compulsory self-incrimination, upon which the Miranda decision was based, is governmental coercion, the Miranda warnings protect criminal suspects against governmental coercion leading them to surrender rights secured by theFifth Amendment; it goes no further than that. Id., at 165-67 CT Page 3194 169-70. Accordingly, the absence of coercive police activity is fatal to a claim of involuntariness under the due process analysis.
"The ultimate test remains . . .`is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborn and his capacity for self-determination critically impaired, the use of his confession offends due process.'" Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S.Ct. 2041,36 L.Ed.2d 854 (1973); State v. Schroff, 206 Conn. 182, 196; State v. Barrett, supra, 452. The court determines the voluntariness of a confession based upon the totality of the circumstances. State v. Boscarino, 204 Conn. 714, 740. See also 1 W. LaFave J. Israel, Criminal Procedure, (1984) section 6.2. In assessing the totality of the surrounding circumstances both the characteristics of the accused and the details of the interrogation are considered. Schneckloth v. Bustamonte, 412 U.S. at 226; State v. Schroff, supra, 202. Some of the considerations include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food and sleep. Id.; State v. Toste, 198 Conn. 573,584.
Aside from the violation of the defendant's Miranda rights, the initial questioning by Sweeney at Humphrey Street did not produce an involuntary confession. The defendant thought he was going to die and readily and quickly made statements after Sweeney asked him what he knew about the Derby murders. The defendant had experience with the criminal justice system and no doubt had received Miranda warnings on earlier occasions. He had a college education. No threats or promises were made during the questioning. While Roseboro couldn't go anywhere because of his physical condition, this fact, brought about by his own conduct, is not critical and does not make his statements involuntary. While the dying declaration exception to the hearsay rule does not apply here, since Roseboro was not a victim and did not die, the concept behind it is that statements by a person who thinks he is dying tend to be reliable and voluntary.
There is no material difference with the statements made by Roseboro in the ambulance on the way to the hospital. He readily answered questions from the police officers without extensive prompting, threats or promises. There is no indication that he was under drugs or that his weakened CT Page 3195 condition due to the knife wounds weakened his resistance to questioning sufficiently to make his statements coerced and involuntary.
The first interrogation at the hospital occurred after Sweeney was told that Roseboro's wounds were not fatal, informed him of that fact after advising him of his constitutional rights. Roseboro still answered questions for a few minutes when he refused to answer additional questions. Whether this was due to his physical condition at the time is unclear. The police should not have questioned him further. This was a violation of his rights under Miranda but these additional statements were otherwise voluntary.
The same is true of subsequent questioning of Roseboro on August 27 after the operation or the later interrogations of August 28, August 29, August 30, August 31, September 2 and September 8, 1989. After the operation Roseboro seemed alert, and while he had some difficulty in signing the waiver of rights form because of his physical condition and the hospital paraphernalia such as tubes, there is nothing to indicate that his statements were involuntary or that he was under the influence of drugs or medication which impaired his resistance. While the police questioned him several times over a period of several days, none of the interrogations were excessively long, and the defendant was not subjected to continuous questioning. Unlike the occasion when he was about to enter the operating room, when he was in an anxious and weakened condition, on all subsequent occasions he seemed willing to talk to the police. This was consistent with the fact that when he was questioned both at Humphrey Street and in the ambulance he quickly and readily talked with the police.
The situation differs from cases such as Mincey v. Arizona, supra, where the defendant was confined to an intensive care unit of a hospital, was questioned when he was barely conscious and while encumbered by tubes, needles and breathing apparatus and repeatedly asked that interrogations stop until he could get a lawyer; the statements were found to be involuntary. In State v. Wynter, 19 Conn. App. 654
(1989) it was held that a statement made by a defendant in a hospital being treated for a gunshot wound was a voluntary statement even though he had been administered medication. A finding that the defendant understood and voluntarily waived his Miranda rights was upheld.
6. Waiver of Miranda rights
A related question to the voluntariness of the CT Page 3196 statements in the hospital is whether the defendant waived his Miranda rights. The state must show by a preponderance of the evidence that the defendant's waiver of his Miranda rights was knowingly, intelligently, and voluntarily made. State v. Hernandez, 204 Conn. 377, 395; State v. Chung, supra, 48. Waiver has two distinct dimensions. First of all, relinquishment of the right must have been voluntary as the product of a free and deliberate choice. Second, the waiver must have been made knowingly and intelligently, with full awareness of both the nature of the right being relinquished and the consequences of that decision. The question of waiver must be determined on the particular facts and circumstances of the case. North Carolina v. Butler, 441 U.S. 369, 374,375, 99 S.Ct. 1755 60 L.Ed.2d 286 (1979); State v. Hernandez, supra, 395; State v. Chung, supra, 48. The totality of the circumstances test is applied to determine if there was an uncoerced choice and the necessary level of comprehension for an effective waiver of Miranda rights. State v. Jones, 205 Conn. 638, 655. Factors which may be considered in determining whether there was a knowing and intelligent waiver in the defendant's experience with the police and familiarity with the warnings; his level of intelligence; his age; his level of education; his vocabulary and ability to read and right in the language in which the warnings were given; intoxication; his emotional state; and the existence of any mental disease, disorder or mental retardation. State v. Hernandez, supra, 396, 397 and cases cited therein. See also 1 W. LaFave J. Israel, Criminal Procedure, section 6.9; State v. Usry, 205 Conn. 298, 305,306. The discussion on the voluntariness of the statements also applies to the defendant's waiver of his Miranda rights for the post operative statements. The defendant had experience with the police, was familiar with the warnings, had a college education and was not under any apparent mental disability or any physical disability which precluded him from understanding the warnings given. He also signed a waiver of his Miranda rights, although that is not controlling.
The defendant was in a hospital, not a police station, and was under the supervision of medical personnel. While he was questioned several times between August 27 and September 2, none of these questioning sessions were lengthy, and a considerable period of time elapsed between them.
The defendant voluntarily and knowingly waived his Miranda rights in all of the post operative interrogations. 7. Whether hospital statements were derivative from and barred by prior inadmissible statements CT Page 3197
The next claim is that the defendant's later statements were affected by the statements at Humphrey Street and in the ambulance where the defendant did not receive Miranda warnings. There is a material distinction between the situation where prior statements are after the failure of the police to give Miranda warnings, and prior statements which were involuntary. The statements here fall in the first category, not the second.
Where a second, voluntary statement with proper Miranda warnings follows a prior statement which was involuntary, the second confession or statement is not admissible unless the state shows that the second statement was not a result of the prior one after considering the totality of the circumstances, and especially whether there was a break in the stream of events between the two statements. State v. Manfredi, 213 Conn. 500, 525; State v. Schroff, supra, 197; State v. Shifflett, supra, 740-742.
Relevant factors in assessing the causal connection between an involuntary statement and a subsequent confession include the proximity in time of the two statements, the presence of intervening circumstances and the flagrancy of the official misconduct. State v. Schroff, supra, 197, 198. However, this situation does not exist here because the statements made at Humphrey Street and in the ambulance were not involuntary, but only obtained in violation of the Miranda requirements.
Where the only violation is failure to give proper Miranda warnings, and the earlier statements were otherwise voluntary, it was held in Oregon v. Elstad, supra,470 U.S. at 318, "that a suspect that has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." Accordingly, while the two prior statements of the defendant are not admissible solely because of the failure of the police to give Miranda warnings, even though the later statements covered the same subject matter, the defendant is not entitled to have the later statements suppressed where these statements at the hospital were made after Miranda warnings and a valid waiver of the defendant's rights. See also State v. Shifflett, supra, 740. The court in Oregon v. Elstad rejected the "fruit of the poisonous tree" analysis which applies to Fourth Amendment violations and reasoned that a subsequent administration of the Miranda warnings to a suspect who has already given a voluntary but unwarned statement will remove the conditions that precluded admission of the earlier statement. 470 U.S. at 303-309. A statement obtained in violation of the Miranda rules can also be used to develop evidential leads, provided the police CT Page 3198 error is one committed in good faith and is neither wilful nor negligent. Michigan v. Tucker, 417 U.S. 433, 449-452.
8. Admissibility of the tea cup
The defendant claims that the tea cup should not be admitted in evidence because the police discovered it solely as a result of the defendant's statement in the house or the ambulance. The State claims admissibility on two grounds: (1) the police can follow leads from statements which are suppressed only because of Miranda violations; and (2) the inevitable discovery rule. The court agrees with the State on both grounds.
(a) evidence derived from statements
While Oregon v. Elstad, supra, limited to its facts, only rejected application of the fruits of the poisonous tree doctrine to a subsequent confession, the opinion suggests that the concept also applies to physical evidence acquired through a Miranda violation confession which is otherwise voluntary. 1 W. LaFave J. Israel, Criminal Procedure, section 9.5(b). New York v. Harris, 109 L.Ed.2d 13, 20
(1990) also suggests some policy rules why leads on evidence obtained from statements given without following the Miranda ruling should not be excluded. The purpose of the exclusionary rule is to deter illegal police activity; the penalties imposed on the government, and in turn upon the public, because police officers have violated the law must bear some relation to the purposes which the law is to serve. The seriousness of the violation is a material consideration. Id., 21. Under the circumstances here there is no indication of bad faith on the part of the police. The bottom line is that they were trying to solve the murders, and believed they had their last chance to determine from the defendant, whom they expected to die, whether he was involved. While the statement made in the ambulance referring to the tea cup, was then a new piece of evidence, it was not one the police were specifically trying to discover from the defendant. While the good faith exception to the exclusionary rule does not apply to a defective search in the context of the Fourth Amendment, State v. Marsala, 216 Conn. 150, so that evidence derived from prior action is inadmissible, the same considerations do not apply in a Fifth Amendment context. Michigan v. Tucker, supra. Assuming the police would not have discovered the tea cup without the defendant's statement in the ambulance, it can still be produced as physical evidence at the trial.
In State v. Shifflett, supra, 740, 741, our Supreme Court discussed and followed Oregon v. Elstad, supra, where a CT Page 3199 confession occurred one day after a Miranda violation. Recognizing the distinction between "simple failure to administer the warnings, unaccompanied by any actual coercion," and more serious Miranda violations where the police have employed "improper tactics or inherently coercive methods that are calculated to undermine the suspect's ability to exercise his free will", the second statement was upheld since there was no showing of improper police tactics and the statements were voluntary.
While Elstad and Shifflett only rejected application of the fruit of the poisonous tree doctrine as applied to a subsequent confession, the Elstad opinion indicates a similar result for physical evidence acquired through a Miranda violation type of confession. 1 W. LaFave J. Israel, Criminal Procedure, section 9.5. Federal decisions have taken this approach. United States v. Cherry, 794 F.2d 201, 207
(5th Cir. 1986) (murder weapon derived from statement); United States v. Sanginetto-Miranda, 859 F.2d 1501, 1518
(6th Cir. 1988) (truck containing narcotics); United States v. Barte, 868 F.2d 773, 774 (5th Cir. 1989) ($20 bill). (b) inevitable discovery
The State has also shown by a preponderance of the evidence that the tea cup would have been discovered anyway by the police, who were in the process of searching the area where the tea cup was ultimately found on August 28, 1989. While it is arguably suspicious that this discovery was made one day after Roseboro's statement in the ambulance, and at the location described by him, the court accepts the testimony of Detective David Bates of the Connecticut State Police that the search for physical evidence had not concluded at the time and that they were about to search the area where the tea cup was found.
Under the inevitable discovery rule, evidence illegally secured in violation of a defendant's constitutional rights need not be suppressed if the state demonstrates by a preponderance of the evidence that the physical evidence obtained would have been ultimately discovered by lawful means. State v. Badgett, 200 Conn. 412, 433 (1986); Nix v. Williams, 467 U.S. 431, 444 (1984). To qualify for admissibility under this rule the state must show that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior to the occurrence of the constitutional violation. State v. Badgett, supra, 433. The police search here was ongoing, and was pursued before and after the defendant's statement on August 27, 1989. The area where the tea cup was found was open to the public, and therefore was not a protected area. There was CT Page 3200 some pattern to the police search operations, and no reason to believe that the police would not have discovered the tea cup without the somewhat vague statement made by the defendant.
Whether the police would have realized the significance of the tea cup without the defendant's statement is another matter, but it does not prevent admission of the evidence under the inevitable discovery rule. The critical factor for the rule is that the state was investigating by lawful means which were being actively pursued prior to the occurrence of the constitutional violation, which in this case was the unwarned statement of the defendant in the ambulance. The search was commenced in the vicinity of the crime scene prior to the statement and was ongoing when the statement was made, and it is more probable than not that the cup would ultimately have been discovered. In such cases the rule is properly applied. State v. Ortiz, 14 Conn. App. 493, 502. If the search was not being actively pursued until after the statement the rule would not apply, State v. Rogers,18 Conn. App. 104, 109, but that is not the case here. The purpose of the inevitable discovery rule is that it places the state and the accused in the same positions that they would have been in if they impermissible conduct had not occurred. Nix v. Williams, supra, 467 U.S. at 447; State v. Ortiz, supra, 502.
9. The search of the locker
The second search of the defendant's locker at Carlon Products occurred on August 29, 1989 when Roseboro was still in the hospital. The defendant was not informed that this search was going to take place and was not asked for his consent for the search. Two weeks earlier, on August 15, he did consent to a search of the locker, signed a consent form, went with the police to Carlon Products and opened the locker for them. The search on August 29 was made without a search warrant. The State claims that the search was justified on three grounds: (1) the consent given by Roseboro two weeks earlier, and evidenced by the consent form, was still valid; (2) there was no reasonable expectation of privacy in the locker; and (3) the locker and its contents had been abandoned by the defendant.
Warrantless searches are unreasonable per se under theFourth Amendment, subject only to a few specifically established and well defined exceptions. Schneckloth v. Bustamonte, supra, 219, quoting Katz v. United States,389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); State v. Dukes, 209 Conn. 98, 121; State v. Copeland, 205 Conn. 201, CT Page 3201 209; State v. Zindros, 189 Conn. 228, 236-237. The burden is on the prosecution to justify the exception. State v. Copeland, supra, 210; State v. Badgett, supra, 424.
(a) expectation of privacy in a locker
The protection of a search without a warrant is limited to those areas or places where an individual has a reasonable expectation of privacy. Kimmelman v. Morrison, 477 U.S. 365,374 (1986); State v. Reddick, 207 Conn. 323, 330; State v. Santiago, 8 Conn. App. 290, 296 (1986). In order to obtain protection under the Fourth Amendment of the U.S. Constitution
and Article First, Section 7 of the Connecticut Constitution from a search and seizure of evidence the defendant must have reasonable expectation of privacy in the place or object searched or obtained, State v. Reddick, supra, 330; State v. Brown, 198 Conn. 348, 355. Whether a reasonable expectation of privacy exists is a determination to be made on a case by case basis. State v. Reddick, supra, 331; State v. Brown, supra, 356; State v. Zindros, supra, 239-40. This requires a two part determination: first, whether the individual has exhibited an actual subjective expectation of privacy, and second, whether that expectation is one society recognizes as reasonable. Katz v. United States, supra, 389 U.S. at 361; State v. Reddick, supra, 331; State v. Zindros, supra, 339. Among the factors considered are: (1) the use made of the premises searched; (2) the normal precautions taken to maintain privacy; and (3) the property interests of the objecting party in the area of the search. Rakas v. Illinois, 439 U.S. 128, 152-53 (1978); Katz v. United States, supra, 361. See also State v. Reddick, supra, 331-333. 1. W. LaFave, Search and Seizure, Section 2.1. A proprietary or possessory relationship to the area of a search is also relevant in determining whether an individual's expectations of privacy are reasonable. Rakas v. Illinois, supra, 144n. 12, 149; State v. Cooper, 9 Conn. App. 15,21. A property interest is not an absolute prerequisite to a finding of a reasonable expectation of privacy in an item or area searched. Id. 21; State v. McLucas, 172 Conn. 542,546-548.
Roseboro and other employees of Carlon Products were given lockers in a lunchroom to change their clothes and store their personal effects. Unlike some locker rooms, each employee was assigned a specific locker by the employer. This area was not open to the general public. Locks could be placed on the lockers, and some of them had locks on August 29, 1989. The defendant's locker had no lock on it at that time. While the lockers themselves were owned by the employer, the employees had a reasonable expectation of CT Page 3202 privacy in the lockers assigned to them. This was true whether or not there was a lock on the locker, as a reasonable expectation of privacy does not require the maximum security required to prevent break-ins of thefts. In State v. Edwards, 214 Conn. 57, 75 (1990) it was held that a defendant, who was an invited guest temporarily residing in an apartment, had a reasonable expectation that even if the tenant consented to a search of the apartment that this did not extend to a search of the guest's backpack. In State v. Callari, 194 Conn. 18, 24, it was held that although a defendant could not challenge the search of a house in which he was a transient social guest, he could challenge the search of his own suitcase located within the house. In State v. Cooper, 9 Conn. App. 15, 21 was held that a passenger in a car had a legitimate expectation of privacy in his overcoat which was in the locked trunk of the car.
The reasonable expectation of privacy concept has been extended to business or commercial premises, at least as to areas that are not open to the public at large. See 1 W. LaFave, Search and Seizure, Section 2.4(b) pp. 432, 433. In O'Connor v. Ortega, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) it was held that an expectation of privacy protected by theFourth Amendment exists for work areas such as offices and the desks and files in them even though the office was subject to entry by supervisors, other employees and business and personal invitees.
While the evidence at the hearing did not prove that the police had consent of the defendant's employer to search his locker, the employee's expectation of privacy is not changed by the fact that the employer approves the search. Two factors have been considered important by the courts in resolving this issue: (1) the extent to which the particular area searched may be said to have been set aside for the personal use of the employee; and (2) the extent to which the search was prompted by a unique or special need of the employer to maintain close scrutiny of employees. 3 W. LaFave, Search and Seizure, Section 8.6(d) p. 324. In United States v. Blok, 188 F.2d 1019 (D.C. Cir. 1951), it was held that the consent of the defendant's supervisor to search the defendant's desk at a government office where she was employed was improper. In United States v. Speights, 557 F.2d 362
(3d. Cir. 1977) it was held that even though a police department had a substantial interest in the integrity of its employees, that the search of the locker of a police officer was improper. The court concluded that the officer's expectation of privacy in his locker was reasonable, as (1) use of private locks on the lockers had been tacitly approved, (2) the lookers were frequently used to store CT Page 3203 personal effects, (3) no department regulation provided that lockers might be opened and (4) there was no prior practice of unconsented to locker searches. In State v. Zindros, supra, 243, it was held that a tenant had a reasonable expectation of privacy in a store even after a fire when he was excluded from the premises, and the landlord could not consent to a search even though the landlord had some right to enter the store for purposes of inspecting and cleaning. (b) search based on consent form
The State claims that the defendant's consent to the search on August 15 and his signing of the consent form at that time authorized the subsequent search on August 29th. The State has the burden of proving consent. State v. Jones,193 Conn. 70, 79. As stated in State v. Reagan, 209 Conn. 1,13:
 "`When the police are relying upon consent as the basis for their warrantless search, they have no more authority than they have been given by the consent. It is thus important to take account of any express or implied limitations or qualifications attending that consent which establish the permissible scope of the search in terms of such matters as time, duration, area or intensity.' 3 W. LaFave, Search and Seizure (2d Ed.) Section 8.1(c), p. 160. The State bears the burden affirmatively to establish that consent was voluntary; State v. Jones, supra, 78; Dotson v. Warden, supra, 619; and the consent shall not be lightly inferred. See United States v. Impink, 728 F.2d 1228, 1232 (9th Cir. 1984); 68 Am. Jur.2d 699, Search and Seizures, Section 46."
Aside from the consent form in their files, the police had nothing to justify the second search which occurred fourteen days after they had previously searched the defendant's locker. Despite the fact that the search form does not contain a time limitation, a reasonable person would assume that it would apply only to one search and that it would not be in effect indefinitely, at least in the absence of evidence showing that the parties had a different understanding. The fact that the original consent was given to Coffey and Revoir, as stated in the form, but the second search was done by LaJeunesse and White without getting further approval from Roseboro, supports this conclusion, even if not controlling.
While the issue has apparently not been resolved by either the United States Supreme Court or the Connecticut CT Page 3204 courts, the general rule is that consent given for an earlier search does not remain in effect for subsequent searches, except where re-entry is a continuation of the initial lawful entry and search and occurs on the same day. 68 Am. Jur.2d 754, Searches and Seizures, Section 101; State v. Douglas, 123 Wis.2d 13, 365 N.W.2d 580, 585 (1985); People v. Chism, 32 Mich. App. 610, 189 N.W.2d 435, 444, 445
(1971), aff'd., 390 Mich. 104, 211 N.W.2d 193 (1973). Other cases have indicated that how long a consent to search lasts depends upon the facts and circumstances of each case and the reasonableness of the lapse of time between the consent and the search. People v. Shelton, 110 Ill. App.3d 625,442 N.E.2d 928, 932 (1982); Gray v. State, 441 A.2d 209 (Del. 1982). "In judging what is reasonable deference should be given to the general rule that a consent is ordinarily given upon the understanding that the search will be conducted forthwith and that only a single search will be made." People v. Shelton, supra, 932.(search 13 days after consent was signed held illegal). In People v. Trujillo, 40 Colo. App. 186, 576 P.2d 179
(1977), a consent form with no time limit was held to authorize one search two days after the initial consent, while in State v. Douglas, supra, and People v. Chism, supra, consent to search on a particular day was held insufficient to justify the actions of police officers in returning to a house for a subsequent search two days later. In the cases where a second search was allowed it occurred on the same day and was considered a continuation of the initial search.
The State has not identified and the court has not been able to find any cases where a second search was upheld merely because the defendant consented to a prior search two weeks earlier. While some time lapse between the initial and subsequent search may be justified in some cases, fourteen days is clearly too long. Even section 54-33 (c) of the General Statutes, allowing search with a warrant, requires the search warrant to be executed within ten days after it is issued. See also State v. Burgos, 7 Conn. App. 265, 271, indicating that constitutional limitations may require execution in a shorter time period. (c) abandonment claim
The State's final claim is that since the defendant indicated to his employer that he was leaving work for personal reasons on August 25, 1989 and picked up his check on that date without cleaning out his locker that this was an abandonment of the contents of the locker, allowing their seizure on August 29th.
Abandoned property is not subject to the protection of the Fourth Amendment. Abel v. United States, 362 U.S. 217, CT Page 3205 241 (1960). Abandonment is a question of fact and it implies a voluntary and intentional renunciation, but the intent may be inferred as a fact from the surrounding circumstances. State v. Zindros, supra, 240. Abandonment for purposes of the Fourth Amendment exists only if the defendant has voluntarily discarded the property, left it behind or otherwise given up his interest in it under circumstances indicating that he has given up any further reasonable expectation of privacy with regard to it at the time of the search. (United States v. Colbert, 474 F.2d 174, 176 (5th Cir. 1973); City of St. Paul v. Vaughn, 306 Minn. 377,237 N.W.2d 365, 370, 371 (1975); State v. Philbrick,436 A.2d 844, 854 (Me. 1981); 1 W. LaFave, Search and Seizure, section 2.6(b), p. 465. In State v. Zindros, supra, it was held that the lessee of property that had been gutted by fire did not abandon his property, and had standing to challenge a search made eleven days after the fire.
While the abandonment cases turn on their specific facts, generally abandonment is found only when the owner discards the property in a public area or clearly indicates that he does not intend to return and retrieve it. When the defendant picked up his check and indicated he was leaving work for personal reasons, nothing was said about the personal effects in his locker, which was at the Carlon Products plant at another location. On August 25 the defendant did not have a car, and he would have had to walk a considerable distance to the other location in order to clean out his locker on the same date. While it is debatable whether he intended to return to work at Carlon Products, the defendant's transportation problems and the value of the goods support the defendant's testimony that he intended to return at a later date and clean out his locker. Most important, the property remained in the locker assigned to the defendant where he had a reasonable expectation of privacy, four days had elapsed since the defendant left work, and two of them were spent in the hospital. Abandonment has not been proven by a preponderance of the evidence.
10. Conclusion
The motion to suppress is granted as to the two initial statements of the defendant on August 27, 1989 and part of the statement made before the defendant was taken to the operating room at Yale New Haven Hospital on the same date, after he asked the police to stop questioning him. The motion to suppress is also granted as to any items seized from the search of the defendant's locker on August 29, 1989. The motion to suppress is denied as to other statements of the defendant and evidence obtained by the police. CT Page 3206
ROBERT A. FULLER, JUDGE